# **EXHIBIT A**

NUMBER 3 OF

## STANDARD FORM OF STORE LEASE
### The Real Estate Board of New York, Inc.

EXECUTED

COUNTERPARTS

**Agreement of Lease,** made as of this the 1st day of August 19 87, between 40 CENTRAL PARK SOUTH, INCORPORATED, a New York corporation, having an office at 40 Central Park South, New York, New York, party of the first part, hereinafter referred to as OWNER, and LIEDERMAN/LOWY VENTURES, INC., a New York corporation, having an office at 40 Central Park South, New York, New York, party of the second part, hereinafter referred to as TENANT,

WITNESSETH: Owner hereby leases to Tenant and Tenant hereby hires from Owner the portion of the ground floor as shown on Exhibit A annexed hereto ("Ground Floor Premises") and the portions of the cellar as shown on Exhibit B annexed hereto (collectively, "Cellar Premises") (the Ground Floor Premises and Cellar Premises being hereinafter collectively referred to as the "demised premises") in the buildings known as 40 Central Park South and 41 West 58th Street, in the Borough of Manhattan, City of New York (collectively, "Building"), for the term of fifteen (15) years ("Term") (or until the Term shall sooner cease and expire as hereinafter provided) to commence on August 1, 1987 ("Commencement Date") and expire on July 31, 2002, both dates inclusive, at an initial fixed annual rental rate ("Fixed Rent") of Two Hundred Fifty Thousand and 00/100ths ($250,000.00) Dollars

which Tenant agrees to pay in lawful money of the United States which shall be legal tender in payment of all debts and dues, public and private, at the time of payment, in equal monthly installments in advance on the first day of each month during said term, at the office of Owner or such other place as Owner may designate, without any set off or deduction whatsoever, except that Tenant shall pay the first         monthly installment(s) on the execution hereof (unless this lease be a renewal).

The parties hereto, for themselves, their heirs, distributees, executors, administrators, legal representatives, successors and assigns, hereby covenant as follows:

**Rent:**        1. Tenant shall pay the rent as above and as hereinafter provided.

1    **Occupancy:**   2. Tenant shall use and occupy demised premises for a first-class American restaurant, including as incidental thereto the sale of liquors, wines and other alcoholic beverages

and for no other purpose. Tenant shall at all times conduct its business in a high grade and reputable manner, shall not violate Article 37 hereof, and shall keep show windows and signs in a neat and clean condition.

**Alterations:**    3. Tenant shall make no changes in or to the demised premises of any nature without Owner's prior written consent. Subject to the prior written consent of Owner, and to the provisions of this article, Tenant at Tenant's expense, may make alterations, installations, additions or improvements which are non-structural and which do not affect utility services or plumbing and electrical lines, in or to the interior of the demised premises by using contractors or mechanics first approved by Owner. Tenant shall, before making any alterations, additions, installations or improvements, at its expense, obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies and (upon completion) certificates of final approval thereof and shall deliver promptly duplicates of all such permits, approvals and certificates to Owner and Tenant agrees to carry and will cause Tenant's contractors and sub-contractors to carry such workman's compensation, general liability, personal and property damage insurance as Owner may require. If any mechanic's lien is filed against the demised premises, or the building of which the same forms a part, for work claimed to have done for, or materials furnished to, Tenant, whether or not done pursuant to this article, the same shall be discharged by Tenant within ten days thereafter, at Tenant's expense, by filing the bond required by law. All fixtures and all paneling, partitions, railings and like installations, installed in the premises at any time, either by Tenant or by Owner in Tenant's behalf, shall, upon installation, become the property of Owner and shall remain upon and be surrendered with the demised premises unless Owner, by notice to Tenant no later than twenty days after the date fixed as the termination of this lease, elects to relinquish Owner's rights thereto and to have them removed by Tenant, in which event, the same shall be removed from the premises by Tenant promptly after /        at Tenant's expense. Nothing in this article shall be construed to give Owner title to or to prevent Tenant's removal of trade fixtures, moveable office furniture and equipment, but upon removal of any such from the premises or upon removal of other installations as may be required by Owner, Tenant shall immediately and at its expense, repair and restore the premises to the condition existing prior to installation and repair any damage to the demised premises or the building due to such removal. All property permitted or required to be removed by Tenant at the end of the term remaining in the premises after Tenant's removal shall be deemed abandoned and may, at the election of Owner, either be retained as Owner's property or may be removed from the premises by Owner at Tenant's expense.—6

**Repairs:**    4. Owner shall maintain and repair the public portions of the building, both exterior and interior, except that if Owner allows Tenant to erect on the outside of the building a sign or signs, or a hoist, lift or sidewalk elevator for the exclusive use of Tenant, Tenant shall maintain such exterior installations in good appearance and shall cause the same to be operated in a good and workmanlike manner and shall make all repairs thereto necessary to keep same in good order and condition, at Tenant's own cost and expense, and shall cause the same to be covered by the insurance provided for hereafter in Article 8. Tenant shall, throughout the term of this lease, take good care of the demised premises and the fixtures and appurtenances therein, and the sidewalks adjacent thereto, and it its sole cost and expense, make all non-structural repairs thereto as and when needed to preserve them in good working order and condition, reasonable wear and tear, obsolescence and damage from the elements, fire or other casualty, excepted. If the demised premises be or become infested with vermin, Tenant shall at Tenant's expense, cause the same to be exterminated from time to time to the satisfaction of Owner. Except as specifically provided in Article 9 or elsewhere in this lease, there shall be no allowance to the Tenant for the diminution of rental value and no liability on the part of Owner by reason of inconvenience, annoyance or injury to business arising from Owner, Tenant or others making or failing to make any repairs, alterations, additions or improvements in or to any portion of the building or the demised premises or in and to the fixtures, appurtenances or equipment thereof. The provisions of this article 4 with respect to the making of repairs shall not apply in the case of fire or other casualty which are dealt with in article 9 hereof.—8

**Window Cleaning:**    5. Tenant will not clean nor require, permit, suffer or allow any window in the demised premises to be cleaned from the outside in violation of Section 202 of the New York State Labor Law or any other applicable law or of the Rules of the Board of Standards and Appeals, or of any other Board or body having or asserting jurisdiction.

**Requirements of Law, Fire Insurance:**    6. Prior to the commencement of the lease term, if Tenant is then in possession, and at all times thereafter, Tenant at Tenant's sole cost and expense, shall promptly comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law, and all orders,

2

3

4

5

5A

6

7

rules and regulations of the New York Board of Fire Underwriters or the Insurance Services Office, or any similar body which shall impose any violation, order or duty upon Owner or Tenant with respect to the demised premises, and with respect to the portion of the sidewalk adjacent to the premises, if the premises are on the street level, whether or not arising out of Tenant's use or manner of use thereof, or with respect to the building if arising out of Tenant's use or manner of use of the premises or the building (including the use permitted under the lease). Except as provided in Article 29 hereof, nothing herein shall require Tenant to make structural repairs or alterations unless Tenant has by its manner of use of the demised premises or method of operation therein, violated any such laws, ordinances, orders, rules, regulations or requirements with respect thereto. Tenant shall not do or permit any act or thing to be done in or to the demised premises which is contrary to law, or which will invalidate or be in conflict with public liability, fire or other policies of insurance at any time carried by or for the benefit of Owner. Tenant shall pay all costs, expenses, fines, penalties or damages, which may be imposed upon Owner by reason of Tenant's failure to comply with the provisions of this article. If the fire insurance rate shall, at the beginning of the lease or at any time thereafter, be higher than it otherwise would be, then Tenant shall reimburse Owner, as additional rent hereunder, for that portion of all fire insurance premiums thereafter paid by Owner which shall have been charged because of such failure by Tenant, to comply with the terms of this article. In any action or proceeding wherein Owner and Tenant are parties, a schedule or "make-up" of rate for the building or demised premises issued by a body making fire insurance rates applicable to said premises shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rate then applicable to said premises.

**Sub-ordination:**  7. This lease is subject and subordinate to all ground or underlying leases and to all mortgages which may now or hereafter affect such leases or the real property of which demised premises are a part and to all renewals, modifications, consolidations, replacements and extensions of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lease or by any mortgagee, affecting any lease or the real property of which the demised premises are a part. In confirmation of such subordination, Tenant shall execute promptly any certificate that Owner may request.

**Tenant's Liability Insurance Property Loss, Damage, Indemnity:**  8. Owner or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the building, nor for loss of or damage to any property of Tenant by theft or otherwise, nor for any injury or damage to persons or property resulting from any cause of whatsoever nature, unless caused by or due to the negligence of Owner, its agents, servants or employees. Owner or 9 its agents will not be liable for any such damage caused by other tenants or persons in, upon or about said building or caused by operations in construction of any private, public or quasi public work. Tenant agrees, at Tenant's sole cost and expense, to maintain general public liability insurance in standard form in favor of Owner and Tenant against claims for bodily injury or death or property damage occurring in or upon the demised premises, effective from the date Tenant enters into possession and during the term of this lease. Such insurance shall be in an amount and with carriers acceptable to the Owner. On Tenant's default in obtaining or delivering any such policy or policies or failure to pay the charges therefor, Owner may secure or pay the charges for any such policy or policies and charge the Tenant as additional rent therefor. Tenant shall indemnify and save harmless Owner against and from all liabilities, obligations, damages, penalties, claims, costs and expenses for which Owner shall not be reimbursed by insurance, including reasonable attorneys fees, paid, suffered or incurred as a result of any breach by Tenant, Tenant's agents, contractors, employees, invitees, or licensees, of any covenant on condition of this lease, or the carelessness, negligence or improper conduct of the Tenant, Tenant's agents, contractors, employees, invitees or licensees. Tenant's liability under this lease extends to the acts and omissions of any subtenant, and any agent, contractor, employee, invitee or licensee of any subtenant. In case any action or proceeding is brought against Owner by reason of any such claim, Tenant, upon written notice from Owner, will, at Tenant's expense, resist or defend such action or proceeding by Counsel approved by Owner in writing, such approval not to be unreasonably withheld.

**Destruction, Fire and Other Casualty:**  9. (a) If the demised premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this lease shall continue in full force and effect except as hereinafter provided. (b) If the demised premises are partially damaged or rendered partially unusable by fire or other casualty, the damages thereto shall be repaired by and at the expense of Owner and the rent, until such repair shall be substantially completed, shall be apportioned from the day following the casualty according to the part of the premises which is usable. (c) If the demised premises are totally damaged or rendered wholly unusable by fire or other casualty, then the rent shall be proportionately paid up to the time of the casualty and thenceforth shall cease until the date when the premises shall have been repaired and restored by Owner, subject to Owner's right to elect not to restore the same as

hereinafter provided. (d) If the demised premises are rendered wholly unusable or (whether or not the demised premises are damaged in whole or in part ) if the building shall be so damaged that Owner shall decide to demolish it or to rebuild it, then, in any of such events, Owner may elect to terminate this lease by written notice to Tenant given within 90 days after such fire or casualty specifying a date for the expiration of the lease, which date shall not be more than 60 days after the giving of such notice, and upon the date specified in such notice the term of this lease shall expire as fully and completely as if such date were the date set forth above for the termination of this lease and Tenant shall forthwith quit, surrender and vacate the premises without prejudice however, to Owner's rights and remedies against Tenant under the lease provisions in effect prior to such termination, and any rent owing shall be paid up to such date and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. Unless Owner shall serve a termination notice as provided for herein, Owner shall make the repairs and restorations under the conditions of (b) and (c) hereof, with all reasonable expedition subject to delays due to adjustment of insurance claims, labor troubles and causes beyond Owner's control. After any such casualty, Tenant shall   10 cooperate with Owner's restoration by removing from the premises as promptly as reasonably possible, all of Tenant's salvageable inventory and movable equipment, furniture, and other property. Tenant's liability for rent shall resume five (5) days after written notice from Owner that the premises are substantially ready for Tenant's occupancy. (e) Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire or other casualty. Notwithstanding the foregoing, each party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent permitted by law, Owner and Tenant each hereby releases and waives all right of recovery against the other or any one claiming through or under each of them by way of subrogation or otherwise. The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance and also, provided that such a policy can be obtained without additional premiums. Tenant acknowledges that Owner will not carry insurance on Tenant's furniture and/or furnishings or any fixtures or equipment, improvements, or appurtenances removable by Tenant and agrees that Owner will not be obligated to repair any damage thereto or replace the same. (f) Tenant hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this article shall govern and control in lieu thereof. — 11

**Eminent Domain:**  10. If the whole or any part of the demised premises shall be acquired or condemned by Eminent Domain for any public or quasi public use or purpose, then and in that event, the term of this lease shall cease and terminate from the date of title vesting in such proceeding and Tenant shall have no claim for the value of any unexpired term of said lease.

**Assignment, Mortgage, Etc.:**  11. Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns expressly covenants that it shall not assign, mortgage or encumber this agreement, nor underlet, or suffer or permit the demised premises or any part thereof to be used by others, without the prior written consent of Owner in each instance. If this lease be assigned, or if the demised premises or any part thereof be underlet or occupied by anybody other than Tenant, Owner may, after default by Tenant, collect rent from the assignee, under-tenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of the covenant, or the acceptance of the assignee, under-tenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Owner to an assignment or underletting shall not in any wise be construed to relieve Tenant from obtaining the express consent in writing of Owner to any further assignment or underletting.

**Electric Current:**  12. Rates and conditions in respect to submetering or rent inclusion, as the case may be, to be added in ☞ RIDER attached hereto. Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of existing feeders to the building or the risers or wiring installation and Tenant may not use any electrical equipment which, in Owner's opinion, reasonably exercised, will overload such installations or interfere with the use thereof by other tenants of the building. The change at any time of the character of electric service shall in no wise make Owner liable or responsible to Tenant, for any loss, damages or expenses which Tenant may sustain.

**Access to Premises:**  13. Owner or Owner's agents shall have the right (but shall not be obligated) to enter the demised premises in any emergency at any time, and, at other 12 reasonable times, to examine the same and to make such repairs, replacements and improvements as Owner may deem necessary and reasonably desirable to any portion of the building or which Owner may elect to perform, in the premises, following Tenant's failure to 13 make repairs or perform any work which Tenant is obligated to

☞ Rider to be added if necessary.

perform under this lease, or for the purpose of complying with laws, regulations and other directions of governmental authorities. Tenant shall permit Owner to use and maintain and replace pipes and conduits in and through the demised premises and to erect new pipes and conduits therein, provided they are within the walls. Owner may, during the progress of any work in the demised premises, take all necessary materials and equipment into said premises without the same constituting an eviction nor shall the Tenant be entitled to any abatement of rent while such work is in progress nor to any damages by reason of loss or interruption of business or otherwise. Throughout the term hereof Owner shall have the right to enter the demised premises at reasonable hours for the purpose of showing the same to prospective purchasers or mortgagees of the building, and during the last six months of the term for the purpose of showing the same to prospective tenants and may, during said six months period, place upon the premises the usual notice "To Let" which notices Tenant shall permit to remain thereon without molestation. If Tenant is not present to open and permit an entry into the premises, Owner or Owner's agents may enter the same whenever such entry may be necessary or permissible by master key or forcibly and provided reasonable care is exercised to safeguard Tenant's property and such entry shall not render Owner or its agents liable therefor, nor in any event shall the obligations of Tenant hereunder be affected. If during the last month of the term Tenant has removed all or substantially all of Tenant's property therefrom, Owner may immediately enter, alter, renovate or redecorate the demised premises without limitation or abatement of rent, or incurring liability to Tenant for any compensation and such act shall have no effect on this lease or Tenant's obligations hereunder. Owner shall have the right at any time, without the same constituting an eviction and without incurring liability to Tenant therefor to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets, or other public parts of the building and to change the name, number or designation by which the building may be known.

**Vault, Vault Space, Area:** 14. No Vaults, vault space or area, whether or not enclosed or covered, not within the property line of the building is leased hereunder, anything contained in or indicated on any sketch, blue print or plan, or anything contained elsewhere in this lease to the contrary notwithstanding. Owner makes no representation as to the location of the property line of the building. All vaults and vault space and all such areas not within the property line of the building, which Tenant may be permitted to use and/or occupy, is to be used and/or occupied under a revocable license, and if any such license be revoked, or if the amount of such space or area be diminished or required by any federal, state or municipal authority or public utility, Owner shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such revocation, diminution or requisition be deemed constructive or actual eviction. Any tax, fee or charge of municipal authorities for such vault or area shall be paid by Tenant.

**Occupancy:** 15. Tenant will not at any time use or occupy the demised premises in violation of, Articles 2 or 37 hereof, or of, the certificate of occupancy issued for the building of which the demised premises are a part. Tenant has inspected the premises and accepts them as is, subject to the riders annexed hereto with respect to Owner's work, if any. In any event, Owner makes no representation as to the condition of the premises and Tenant agrees to accept the same subject to violations whether or not of record.

**Bankruptcy:** 16 (a) Anything elsewhere in this lease to the contrary notwithstanding, this lease may be cancelled by Landlord by the sending of a written notice to Tenant within a reasonable time after the happening of any one or more of the following events: (1) the commencement of a case in bankruptcy or under the laws of any state naming Tenant as the debtor; or (2) the making by Tenant of an assignment or any other arrangement for the benefit of creditors under any state statute. Neither Tenant nor any person claiming through or under Tenant, or by reason of any statute or order of court, shall thereafter be entitled to possession of the premises demised but shall forthwith quit and surrender the premises. If this lease shall be assigned in accordance with its terms, the provisions of this Article 16 shall be applicable only to the party then owning Tenant's interest in this lease.

(b) It is stipulated and agreed that in the event of the termination of this lease pursuant to (a) hereof, Owner shall forthwith, notwithstanding any other provisions of this lease to the contrary, be entitled to recover from Tenant as and for liquidated damages an amount equal to the difference between the rent reserved hereunder for the unexpired portion of the term demised and the fair and reasonable rental value of the demised premises for the same period. In the computation of such damages the difference between any installment of rent becoming due hereunder after the date of termination and the fair and reasonable rental value of the demised premises for the period for which such installment was payable shall be discounted to the date of termination at the rate of four per cent (4%) per annum. If such premises or any part thereof be re-let by the Owner for the unexpired term of said lease, or any part thereof, before presentation of proof of such liquidated damages to any court, commission or tribunal, the amount of rent reserved upon such re-letting shall be deemed to be the fair and reasonable rental value for the part or the whole of the premises so re-let during the term of the re-letting. Nothing herein contained shall limit or prejudice the right of the Owner to prove for and obtain as liquidated damages by

reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount of the difference referred to above.

**Default:** 17. (1) If Tenant defaults in fulfilling any of the covenants of this lease other than the covenants for the payment of rent or additional rent; or if the demised premises become vacant or deserted; or if any execution or attachment shall be issued against Tenant or any of Tenant's property whereupon the demised premises shall be taken or occupied by someone other than Tenant; or if this lease be rejected under Section 365 of Title II of the U.S. Code (Bankruptcy Code); or if Tenant shall fail to move into or take possession of the premises within fifteen (15) days after the commencement of the term of this lease, of which fact Owner shall be the sole judge; then, in any one or more of such events, upon Owner serving a written five (5) days notice upon Tenant specifying the nature of said default and upon the expiration of said five (5) days, if Tenant shall have failed to comply with or remedy such default, or if the said default or omission complained of shall be of a nature that the same cannot be completely cured or remedied within said five (5) day period, and if Tenant shall not have diligently commenced curing such default within such five (5) day period, and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such default, then Owner may serve a written three (3) days notice of cancellation of this lease upon Tenant, and upon the expiration of said three (3) days, this lease and the term thereunder shall end and expire as fully and completely as if the expiration of such three (3) day period were the day herein definitely fixed for the end and expiration of this lease and the term thereof and Tenant shall then quit and surrender the demised premises to Owner but Tenant shall remain liable as hereinafter provided.

(2) If the notice provided for in (1) hereof shall have been given, and the term shall expire as aforsaid: or if Tenant shall make default in the payment of the rent reserved herein or any item of additional rent herein mentioned or any part of either or in making any other payment herein required, then and in any of such events Owner may without notice, re-enter the demised premises either by force or otherwise, and dispossess Tenant by summary proceedings or otherwise, and the legal representative of Tenant or other occupant of demised premises and remove their effects and hold the premises as if this lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end.

**Remedies of Owner and Waiver of Redemption:** 18. In case of any such default, re-entry, expiration and/or dispossess by summary proceedings or otherwise, (a) the rent, and additional rent, shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration. (b) Owner may re-let the premises or any part or parts thereof, either in the name of Owner or otherwise, for a term or terms, which may at Owner's option be less than or exceed the period which would otherwise have constituted the balance of the term of this lease and may grant concessions or free rent or charge a higher rental than that in this lease, and/or (c) Tenant or the legal representatives of Tenant shall also pay Owner as liquidated damages for the failure of Tenant to observe and perform said Tenant's covenants herein contained, any deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected on account of the subsequent lease or leases of the demised premises for each month of the period which would otherwise have constituted the balance of the term of this lease. The failure of Owner to re-let the premises or any part or parts thereof shall not release or affect Tenant's liability for damages. In computing such liquidated damages there shall be added to the said deficiency such expenses as Owner may incur in connection with re-letting, such as legal expenses, attorneys' fees, brokerage, advertising and for keeping the demised premises in good order or for preparing the same for re-letting. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this lease. Owner, in putting the demised premises in good order or preparing the same for re-rental may, at Owner's option, make such alterations, repairs, replacements, and/or decorations in the demised premises as Owner, in Owner's sole judgement, considers advisable and necessary for the purpose of re-letting the demised premises, and the making of such alterations, repairs, replacements, and/or decorations shall not operate or be construed to release Tenant from liability. Owner shall in no event be liable in any way whatsoever for failure to re-let the demised premises, or in the event that the demised premises are re-let, for failure to collect the rent thereof under such re-letting, and in no event shall Tenant be entitled to receive any excess, if any, of such net rent collected over the sums payable by Tenant to Owner hereunder. In the event of a breach or threatened breach by Tenant or any of the covenants or provisions hereof, Owner shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this lease of any particular remedy, shall not preclude Owner from any other remedy, in law or in equity. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws.

**Fees and Expenses:** 19. If Tenant shall default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under or by virtue of any of the terms or provisions in any article of this lease, then, unless otherwise provided elsewhere in this lease, Owner may ~~immediately~~ or at any time thereafter and without notice perform the obligation of Tenant thereunder, and if, Owner, in connection therewith or in connection with any default by Tenant in the covenant to pay rent hereunder, makes any expenditures or incurs any obligations for the payment of money, including but not limited to attorney's fees, in instituting, prosecuting or defending any actions or proceeding, such sums so paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by Tenant to Owner within five (5) days of rendition of any bill or statement to Tenant therefor, and if Tenant's lease term shall have expired at the time of making of such expenditures or incurring of such obligations, such sums shall be recoverable by Owner as damages.

**No Representations by Owner:** 20. Neither Owner nor Owner's agents have made any representations or promises with respect to the physical condition of the building, the land upon which it is erected or the demised premises, the rents, leases, expenses of operation, or any other matter or thing affecting or related to the premises except as herein expressly set forth and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of this lease. Tenant has inspected the building and the demised premises and is thoroughly acquainted with their condition, and agrees to take the same "as is" and acknowledges that the taking of possession of the demised premises by Tenant shall be conclusive evidence that the said premises and the building of which the same form a part were in good and satisfactory condition at the time such possession was so taken, except as to latent defects. All understandings and agreements heretofore made between the parties hereto are merged in this contract, which alone fully and completely expresses the agreement between Owner and Tenant and any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of it in whole or in part, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

**End of Term:** 21. Upon the expiration or other termination of the term of this lease, Tenant shall quit and surrender to Owner the demised premises, broom clean, in good order and condition, ordinary wear excepted, and Tenant shall remove all its property. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this lease. If the last day of the term of this lease or any renewal thereof, falls on Sunday, this lease shall expire at noon on the preceding Saturday unless it be a legal holiday in which case it shall expire at noon on the preceding business day.

**Quiet Enjoyment:** 22. Owner covenants and agrees with Tenant that upon Tenant paying the rent and additional rent and observing and performing all the terms, covenants and conditions, on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the premises hereby demised, subject, nevertheless, to the terms and conditions of this lease including, but not limited to, Article 33 hereof and to the ground leases, underlying leases and mortgages hereinbefore mentioned.

**Failure to Give Possession:** 23. If Owner is unable to give possession of the demised premises on the date of the commencement of the term hereof, because of the holding-over or retention of possession of any tenant, undertenant or occupants, or if the premises are located in a building being constructed, because such building has not been sufficiently completed to make the premises ready for occupancy or because of the fact that a certificate of occupancy has not been procured or for any other reason, Owner shall not be subject to any liability for failure to give possession on said date and the validity of the lease shall not be impaired under such circumstances, nor shall the same be construed in any way to extend the term of this lease, but the rent payable hereunder shall be abated (provided Tenant is not responsible for the inability to obtain possession) until after Owner shall have given Tenant written notice that the premises are substantially ready for Tenant's occupancy. If permission is given to Tenant to enter into the possession of the demised premises or to occupy premises other than the demised premises prior to the date specified as the commencement of the term of this lease, Tenant covenants and agrees that such occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this lease, except as to the covenant to pay rent. The provisions of this article are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law.

**No Waiver:** 24. The failure of Owner to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this lease or of any of the Rules or Regulations set forth or hereafter adopted by Owner, shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation. The receipt by Owner of rent with knowledge of the breach of any covenant of this lease shall not be deemed a waiver of such breach and no provision of this lease shall be deemed to have been waived by Owner unless such waiver be in writing signed by Owner. No payment by Tenant or receipt by Owner of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement of any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Owner may accept such check or payment without prejudice to Owner's right to recover the balance of such rent or pursue any other remedy

in this lease provided. No act or thing done by Owner or Owner's agents during the term hereby demised shall be deemed an acceptance of a surrender of said premises and no agreement to accept such surrender shall be valid unless in writing signed by Owner. No employee of Owner or Owner's agent shall have any power to accept the keys of said premises prior to the termination of the lease and the delivery of keys to any such agent or employee shall not operate as a termination of the lease or a surrender of the premises.

**Waiver of Trial by Jury:** 25. It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this lease, the relationship of Owner and Tenant, Tenant's use of or occupancy of said premises, and any emergency statutory or any other statutory remedy. It is further mutually agreed that in the event Owner commences any summary proceeding for possession of the premises, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding.

**Inability to Perform:** 26. This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no wise be affected, impaired or excused because Owner is unable to fulfill any of its obligations under this lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repair, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Owner is prevented or delayed from so doing by reason of strike or labor troubles, government preemption in connection with a National Emergency or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency, or when, in the judgement of Owner, temporary interruption of such services is necessary by reason of accident, mechanical breakdown, or to make repairs, alterations or improvements.

**Bills and Notices:** 27. Except as otherwise in this lease provided, a bill, statement, notice or communication which Owner may desire or be required to give to Tenant, shall be deemed sufficiently given or rendered if, in writing, delivered to Tenant personally or sent by registered or certified mail addressed to Tenant at the building of which the demised premises form a part or at the last known residence address or business address of Tenant or left at any of the aforesaid premises addressed to Tenant, and the time of the rendition of such bill or statement and of the giving of such notice or communication shall be deemed to be the time when the same is delivered to Tenant, mailed, or left at the premises as herein provided. Any notice by Tenant to Owner must be served by registered or certified mail addressed to Owner at the address first hereinabove given or at such other address as Owner shall designate by written notice.

**Water Charges:** 28. Tenant shall be furnished with cold water through the existing water meters measuring Tenant's consumption for all purposes. If required, Owner may install additional water meters. Tenant shall pay Owner for the cost of such meters and their installation. Throughout the duration of Tenant's occupancy Tenant shall keep said meters and installation equipment in good working order and repair at Tenant's own cost and expense. Tenant agrees to pay for water consumed, as shown on said meters and with bills are rendered. Tenant covenants and agrees to pay the sewer rent, charge or any other tax, rent, levy or charge which now or hereafter is assessed, imposed or a lien upon the demised premises or the realty of which they are part pursuant to law, order or regulation made or issued in connection with the use, consumption, maintenance or supply of water, water system or sewage or sewage connection or system. The bill rendered by Owner shall be payable by Tenant as additional rent. ~~If the building or the demised premises or any part thereof be supplied with water through a meter through which water is also supplied to other premises Tenant shall pay to Owner as additional rent, on the first day of each month,    %~~ (    ) of the total meter charges, as Tenant's portion. Independently and in addition to any of the remedies reserved to Owner hereinabove or elsewhere in this lease, Owner may sue for and collect any monies to be paid by Tenant or paid by Owner for any of the reasons or purposes hereinabove set forth.

**Sprinklers:** 29. Anything elsewhere in this lease to the contrary notwithstanding, if the New York Board of Fire Underwriters or the Insurance Services Office or any bureau, department or official of the federal, state or city government require or recommend the installation of a sprinkler system or that any changes, modifications, alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Tenant's business, or the location of partitions, trade fixtures, or other contents of the demised premises, or for any other reason, or if any such sprinkler system installations, changes, modifications, alterations, additional sprinkler heads or other such equipment, become necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rate set by any said Exchange or by any fire insurance company, Tenant shall, at Tenant's expense, promptly make such sprinkler system installations, changes, modifications, alterations, and supply additional sprinkler heads or other equipment as

required whether the work involved shall be structural or non-structural in nature. ~~and throughout the Term, repair and maintain ... sprinkler system and at the end of the Term surrender the sprinkler system to Owner in good working condition.~~

**Heat,** 7a
**Cleaning:** 30. As ~~long as Tenant is not in default under any of the covenants of this lease Owner shall,~~ if and insofar as existing facilities permit furnish heat to the demised premises, when and ~~as required by law, on business days from 8:00 a.m. to 6:00 p.m. and on Saturdays from 8:00 a.m. to 1:00 p.m.~~ Tenant shall at Tenant's expense, keep demised premises clean and in order, to the satisfaction to Owner, and if demised premises are situated on the street floor, Tenant shall, at Tenant's own expense, make all repairs and replacements to the sidewalks and curbs adjacent thereto, and keep said sidewalks and curbs free from snow, ice, dirt and rubbish. ~~Tenant shall pay to Owner the cost of removal of any of Tenant's refuse and rubbish from the building.~~ Bills for the same shall be rendered by Owner to Tenant at such times as Owner may elect and shall ~~be due and~~ payable when rendered, and the amount ~~of such bills~~ shall be deemed to be, and be paid as, additional rent. Tenant shall, ~~however, have the option of~~ independently contracting for the removal of all of Tenant's rubbish and refuse from the Building. The removal of such refuse and rubbish by others shall be subject to such rules and regulations as, in the judgment of Owner, are necessary for the proper operation of the building.

28

**Security:** 31. Tenant has deposited with Owner the sum of $ 125,000.00** as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this lease; it is agreed that in the event Tenant defaults in respect of any of the terms, provisions and conditions of this lease, including, but not limited to, the payment of rent and additional rent. Owner may use, apply or retain the whole or any part of the security so deposited to the extent required for the payment of any rent and additional rent or any other sum as to which Tenant is in default or for any sum which Owner may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this lease, including but not limited to, any damages or deficiency in the re-letting of the premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Owner. In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this lease, the security shall be returned to Tenant after the date fixed as the end of the Lease and after delivery of entire possession of the demised premises to Owner. In the event of a sale of the land and building or leasing of the building, of which the demised premises form a part, Owner shall have the right to transfer the security to the vendee or lessee and Owner shall thereupon be released by Tenant from all liability for the return of such security, and Tenant agrees to look to the new Owner solely for the return of said security, and it is agreed that the provisions hereof shall apply to every transfer or assignment made of the security to a new Owner. Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the monies deposited herein as security and that neither Owner nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.
** ["Security Deposit"]

**Captions:** 32. The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this lease nor the intent of any provision thereof.

**Definitions:** 33. The term "Owner" as used in this lease means only the Owner, or the mortgagee in possession, for the time being of the land and building (or the Owner of a lease of the building or of the land and building) of which the demised premises form a part, so that in the event of any sale or sales of said land and building or of said lease, or in the event of a lease of said building, or of the land and building, the said Owner shall be and hereby is entirely freed and relieved of all covenants and obligations of Owner hereunder, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser, at any such sale, or the said lessee of the building, or of the land and building, that the purchaser or the lessee of the building has assumed and agreed to carry out any and all covenants and obligations of Owner hereunder. The words "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning. The term "business days" as used in this lease shall exclude Saturdays (except such portion thereof as is covered by specific hours in Article 30 hereof), Sundays and all days

** Space to be filled in or deleted.
*the central heating system is operating and furnishing
heat to the balance of the 40 Central Park South building.

designated as holidays by the applicable building service union employees service contract or by the applicable Operating Engineers contract with respect to HVAC service.

**Adjacent** 34. If an excavation shall be made upon land ad-
**Excavation—** jacent to the demised premises, or shall be authorized
**Shoring:** to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the demised premises for the purpose of doing such work as said person shall deem necessary to preserve the wall or the building of which demised premises form a part from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Owner, or diminution or abatement of rent.

**Rules and** 35. Tenant and Tenant's servants, employees,
**Regulations:** agents, visitors, and licensees shall observe faithfully, and comply strictly with the Rules and Regulations and such other and further reasonable Rules and Regulations as 29 Owner or Owner's agents may from time to time adopt. Notice of 30 any additional rules or regulations shall be given in such manner as Owner may elect. In case Tenant disputes the reasonableness of any additional Rule or Regulation hereafter made or adopted by Owner or Owner's agents, the parties hereto agree to submit the question of the reasonableness of such Rule or Regulation for decision to the New York office of the American Arbitration Association, whose determination shall be final and conclusive upon the parties hereto. The right to dispute the reasonableness of any additional Rule or Regulation upon Tenant's part shall be deemed waived unless the same shall be asserted by service of a notice, in writing upon Owner 31 within ten (10) days after the giving of notice thereof. Nothing in this lease contained shall be construed to impose upon Owner any duty or obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease, as against any other tenant and Owner shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors or licensees.— 32 33

**Glass:** 36. ~~Owner shall replace, at the expense of Tenant, any and~~ all plate and other glass damaged or broken from any cause whatsoever in and about the demised premises. ~~Owner may insure, and keep insured, at Tenant's expense, all~~ plate and other glass in the demised premises ~~for and in the name of Owner. Bills for the premiums therefor shall be rendered by Owner to Tenant at such times as Owner may elect, and shall be due from, and payable by, Tenant when rendered, and the amount thereof shall be deemed to be, and be paid as, additional rent.~~ — 34

**Pornographic** 37. Tenant agrees that the value of the demised
**Uses** premises and the reputation of the Owner will be seri-
**Prohibited:** ously injured if the premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment. Tenant agrees that Tenant will not bring or permit any obscene or pornographic material on the premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the premises, nor permit use of the premises for nude modeling, rap sessions, or as a so-called rubber goods shop, or as a sex club of any sort, or as a "massage parlor." Tenant agrees further that Tenant will not permit any of these uses by any sublessee or assignee of the premises. This Article shall directly bind any successors in interest to the Tenant. Tenant agrees that if at any time Tenant violates any of the provisions of this Article, such violation shall be deemed a breach of a substantial obligation of the terms of this lease and objectionable conduct. Pornographic material is defined for purposes of this Article as any written or pictorial matter with prurient appeal or any objects of instrument that are primarily concerned with lewd or prurient sexual activity. Obscene material is defined here as it is in Penal Law §235.00.

**Estoppel** 38. Tenant, at any time, and from time to time, upon
**Certificate:** at least 10 days' prior notice by Owner, shall execute, acknowledge and deliver to Owner, and/or to any other person, firm or corporation specified by Owner, a statement certifying that this lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates which the rent and additional rent have been paid, and stating whether or not there exists any defaults by Owner under this lease, and, if so, specifying each such default.

**Successors** 39. The covenants, conditions and agreements
**and Assigns:** contained in this lease shall bind and inure to the benefit of Owner and Tenant and their respective heirs, distributees, executors, administrators, successors, and except as otherwise provided in this lease, their assigns.

SEE RIDER ANNEXED HERETO AND MADE A PART HEREOF.

**In Witness Whereof,** Owner and Tenant have respectively signed and sealed this lease as of the day and year first above written.

Witness for Owner:

40 CENTRAL PARK SOUTH, INCORPORATED

By: _____
Vice President

..........................................

LIEDERMAN/LOWY VENTURES, INC. ....[L.S.]

By: _____ [L.S.]

Witness for Tenant:

..........................................

[CORP. SEAL]

[CORP. SEAL]

RIDER TO LEASE DATED AS OF AUGUST 1, 1987 BETWEEN 40 CENTRAL
PARK SOUTH INCORPORATED, AS LANDLORD, AND LIEDERMAN/LOWY
VENTURES, INC., AS TENANT

If and to the extent that any of the provisions of this
rider conflict or are otherwise inconsistent with any of the
printed provisions of this lease, whether or not such incon-
sistency is expressly noted in this rider, the provisions of
this rider shall prevail.

40.   Rental Payments

(A)  All payments other than Fixed Rent to be made by
Tenant pursuant to this lease shall be deemed additional rent
and, in the event of any non-payment thereof, Landlord shall
have all rights and remedies provided for herein or by law
for non-payment of rent.

(B)  All payments of Fixed Rent and additional rent to
be made by Tenant pursuant to this lease shall be made by
checks drawn upon a New York City bank which is a member of
the New York Clearing House Association or any successor
thereto.

(C)  The acceptance of Fixed Rent or additional rent by
Landlord shall not be deemed to constitute Landlord's consent
to an assignment of this lease or a subletting or other occu-
pancy of the demised premises by anyone other than Tenant,
nor a waiver of any of Landlord's rights or Tenant's obliga-
tions under this lease.

41.   Tax Escalation

(A)  For purposes hereof:

(1)  "Real Estate Taxes" shall mean all the real
estate taxes and assessments imposed by any governmental
authority having jurisdiction upon the Building and land upon
which it is located ("Land") or any tax or assessment here-
after imposed in whole or in part in substitution for such
real estate taxes and/or assessments.  Notwithstanding any-
thing to the contrary in the foregoing, real estate taxes
shall not include any increase in the real estate taxes and
assessments imposed upon the Land and/or Building to the
extent such increase is imposed solely as a result of the
sale of the Land and/or Building or the conversion of the
Building to co-op, condominium or "cond-op" form of own-
ership.

(2)  "Base Year Taxes" shall mean the Real Estate
Taxes as finally determined for the tax fiscal year July 1,
1987 - June 30, 1988 ("Base Year").

(3)  "Subsequent Year" shall mean any tax fiscal
year commencing after the expiration of the Base Year.

(4)  "Tenant's Proportionate Share" shall mean 10%.

(B)  If the Real Estate Taxes for any Subsequent Year
during the Term exceed the Base Year Taxes, Tenant shall pay
Landlord Tenant's Proportionate Share of such excess.

(C)  Such payment shall be due within fifteen days after
the Real Estate Taxes for any Subsequent Year become due and

delivery by Landlord to Tenant of a bill therefor, or, if Real Estate Taxes are payable in installments, the appropriate portion of such payment (based on the number of such installments) shall be due within fifteen (15) days after the date each such installment is due and delivery by Landlord to Tenant of a bill therefor.

(D)  If Landlord receives any refund of Real Estate Taxes for any Subsequent Year for which Tenant has made a payment pursuant hereto, Landlord shall (after deducting from such refund all reasonable expenses incurred in connection therewith) pay Tenant, if not in default hereunder, Tenant's Proportionate Share of the net refund.  If Tenant is in default, Landlord shall hold such amount for the account of Tenant, or may at its option, apply any part thereof to the extent required for the payment of any rent or additional rent as to which Tenant is in arrears hereunder.

(E)  If any Subsequent Year is only partially within the Term, all payments pursuant hereto shall be appropriately prorated, based on the portion of the Subsequent Year which is within the Term.  Except as limited by Articles 9 and 10: (1) Tenant's obligation to make the payments required by subdivisions (B), (C) and (D) shall survive the Expiration Date or any sooner termination of this lease; and (2) Landlord's obligation to make the payments required by subdivision (D) shall survive the Expiration Date or any sooner termination of this lease pursuant to Articles 9 and 10.

42.  Adjustment in Fixed Rent

(A)  (1)  In any calendar year commencing with 1988 (January 1 to December 31) when the Index (as hereinafter defined) goes up more than 5%, the Fixed Rent otherwise payable on January 1st following said calendar year and for the balance of the Term shall be increased by a percentage equal to 50% of such increase in the Index above 5% up to and including 12%.  For example, if the Index for December 1987 is 320 and the Index for December 1988 is 364.8 (which represents a 14% increase), then and on January 1, 1989, the Fixed Rent shall be increased by 3.5% (i.e. 50% of 7%).

(2)  Notwithstanding anything to the contrary in paragraph (1) of this subdivision (A), commencing with calendar year 1995 the figure "50%" contained in said paragraph (1) shall be amended to read "75%" (i.e., with respect to each increase in Fixed Rent pursuant to this Article 42 which takes effect on or after January 1, 1996, the same shall be computed based upon 75% of the increase in the Index over 5% during the prior calendar year up to and including 12%).

(B)  For the purposes hereof, "Index" shall mean the "All-Items" Consumer Price Index for All Urban Consumers in the New York-Northern New Jersey-Long Island, NY-NJ-CT area, determined by the Bureau of Labor Statistics of the United States Department of Labor (1967=100), or, if such index is discontinued, the most comparable index (reflecting changes in costs of housing, energy and services) published by any other federal, New York State or New York City governmental authority.

(C)  The increase in Fixed Rent pursuant to this Article 42 shall be in addition to that provided for in Article 43 hereof.  No provisions hereof shall be construed to permit any reduction in the Fixed Rent.

-2-

43. <u>Increase in Fixed Rent</u>

(A) Notwithstanding anything to the contrary in the foregoing, effective on each of the following dates the Fixed Rent then in effect shall be increased by the following amounts:

| Date of Increase | Amount of Increase |
|---|---|
| August 1, 1988 | $10,000.00 |
| August 1, 1989 | $10,400.00 |
| August 1, 1990 | $10,816.00 |
| August 1, 1991 | $11,248.00 |
| August 1, 1992 | $11,699.00 |
| August 1, 1993 | $12,166.00 |
| August 1, 1994 | $12,654.00 |
| August 1, 1995 | $13,159.00 |
| August 1, 1996 | $13,685.00 |
| August 1, 1997 | $14,234.00 |
| August 1, 1998 | $14,802.00 |
| August 1, 1999 | $15,137.00 |

(B) The foregoing increases in Fixed Rent shall be in addition to those provided for in Article 42 hereof.


44. <u>TV Dish</u>

(A) Subject to Tenant's obtaining and maintaining in effect all governmental approvals and permits required there- for and its compliance with the applicable provisions of this lease with respect thereto (including, without limitation, Articles 3 and 6 hereof), Landlord will not unreasonably withhold its consent to the installation by Tenant on the roof or water tower of the Building of one or two television dishes and related equipment (collectively, "TV Dish") to receive cable television. The location and size of the TV Dish, and the manner in which the same is to be installed on the roof or water tower of the Building and connected to the Demised Premises shall be subject to Landlord's reasonable approval; <u>provided, however</u>, in no event shall Landlord be required to approve any location which would result in the TV Dish being visible from any street adjacent to the Building. The foregoing approval by Landlord shall not be unreasonably delayed. Tenant shall install, maintain, operate and repair the TV Dish at its sole cost and expense and Landlord shall have no responsibility or liability with respect thereto. Tenant shall permit Landlord, at Landlord's sole expense, to connect the TV Dish to four apartments in the Building designated by Landlord. Landlord's expense with respect to such connection shall, however, be limited to the actual cost of connecting the TV Dish to such apartments and any other actual out-of-pocket expenses incurred by Tenant, from time to time, as a result of such connection and Landlord shall not be responsible for the payment of any other charge with respect thereto including, without limitation, any monthly maintenance, service or other charge (except as aforesaid). Landlord, at Tenant's sole expense, shall cooperate with Tenant in obtaining any necessary governmental approvals and permits for the T.V. dish.

(B) Tenant shall not place more than ten (10) televi- sion sets or any other type of visual projection devices in the demised premises. The screens of any such television sets or projection devices located in the demised premises shall not be visible from the streets adjacent to the demised premises such that the programs shown thereon can be viewed from said streets and, in any event, shall not be larger than

twenty-seven (27) inches in diameter except for the screens of two (2) of said television sets or projection devices which shall not be larger than forty-five (45) inches in diameter.

## 45. Air Conditioning; Ventilation

(A) Tenant shall at its sole expense (1) operate, maintain and repair all existing equipment which air conditions and ventilates the demised premises (including, without limitations, the water tower serving the same and related piping) and (2) supply and install any new equipment or installation which may be necessary to properly air condition and ventilate the demised premises.

(B) Landlord shall have no responsibility or liability for (1) the continued performance of any air conditioning or ventilation systems presently located in the demised premises and/or (2) the furnishing of air conditioning or ventilation in the demised premises.

(C) At the end of the Term, Tenant shall surrender all presently and then existing air conditioning and ventilating equipment serving the demised premises in good condition.

(D) Landlord shall provide Tenant with reasonable access to the air-conditioning and ventilating system serving the demised premises sufficient for Tenant to comply with its obligations under this Article 45.

## 46. Electricity and Gas

(A) Tenant shall arrange for, purchase and receive electric current and gas for the demised premises (including, without limitation, any heating, ventilating and air conditioning equipment servicing the same) directly from the public utility company serving the Building ("Utility Company"). Landlord shall permit Landlord's existing wires, risers, conduits and other electrical equipment serving the demised premises (collectively, "Electric Equipment") to be used by Tenant for its electrical service. Tenant shall, at its sole cost and expense, install electric and gas meters measuring Tenant's consumption of electricity and gas and keep such meters in good working order and repair. Tenant shall pay for all electricity and gas consumed, as shown on such meters, as and when bills are rendered by the Utility Company. Tenant covenants and agrees that its use of electric current and its total connected lighting and equipment load will not exceed either the capacity of the Electric Equipment serving the demised premises or the maximum load from time to time permitted by applicable governmental regulations. Landlord shall not in any way be liable or responsible to Tenant for any loss, damage or expense which Tenant may sustain or incur if, during the Term, either the quantity or character of electric current or gas is changed or electric current or gas is no longer available or suitable for Tenant's requirements unless the same was caused by Landlord's negligence.

(B) Tenant shall not make or perform, or permit the making or performing of, any alterations to wiring installations or other electrical facilities in or serving the demised premises (including without limitation, the installation of additional risers) or any additions to the business machines, equipment or other appliances in the demised premises which utilize electrical energy without the prior written consent of Landlord in each instance, which consent

-4-

shall not be unreasonably withheld.  Should Landlord grant
any such consent, all additional risers or other equipment
required therefor which may affect portions of the Building
other than the demised premises shall be installed by Land-
lord (or, at Landlord's option, by Tenant) and the cost
thereof shall be paid by Tenant promptly upon demand.

47.  <u>Restrictions on Use, Operation of the Business</u>

(A)  Supplementing Article 2, Tenant acknowledges that
the demised premises are located on the ground floor of a
first-class New York City residential building and agrees
that it shall not use or permit the use of the demised prem-
ises in a manner which is inconsistent with such circum-
stances.  Tenant shall not use or permit all or any part of
the demised premises to be used so as to impair the Build-
ing's character or dignity or impose any additional burden on
Landlord.

(B)  The use of the demised premises for the purposes
specified in Article 2 shall not in any event be deemed to
include, and Tenant shall not use, or permit the use of, the
demised premises or any part thereo for:

(1)  a cafeteria, luncheonette or coffee shop;

(2)  except as set forth in subdivision (I) herein-
below, the sale of any ethnic or so-called "fast foods";

(3)  the sale of cigars, cigarettes or tobacco
products, other than as incidental to restaurant service of
food and beverages in the demised premises;

(4)  except as set forth in subdivision (J) herein-
below, the sale of newspapers, periodicals or books;

(5)  except as set forth in subdivision (J) herein-
below, the sale of any other products, materials or services,
or the conduct of any business or activity, not appropriate
to the operation and conduct of a high class public restau-
rant; and

(6)  the conduct of a public auction of any kind.

(C)  (1)  Tenant shall operate the dining room, bar and
restaurant business in the demised premises on a daily basis,
including Sundays, during the same normal operating hours of
first class restaurants and bars which are open for lunch,
dinner and late supper.  Notwithstanding the foregoing,
Tenant may close its business for a vacation period of two
(2) weeks in any calendar year (which two weeks need not be
consecutive) plus six (6) holidays in any calendar year.  In
addition, Tenant shall not be in breach of the provisions of
this subdivision (C)(1) in the event it is unable to operate
its business in the demised premises by reason of strikes,
labor troubles, government pre-emption in connection with a
national emergency or any other like circumstance which is
reasonably beyond the control of Tenant (other than the
unavailability of funds).

(2)  The restaurant business conducted by Tenant at
the demised premises shall provide not less than one-hundred
twenty-five (125) seats at tables for service of meals.
During normal operating hours, forty (40) of such seats shall
be at tables located in the rear of the demised premises
("Rear Dining Area") which shall be kept covered with quality
tablecloths.  The balance of the tables in the demised pre-

-5-



mises shall be covered by quality tablecloths, marble or such other finish as may be reasonably approved by Landlord. Notwithstanding anything to the contrary contained in Article 44(B) hereof, no television sets or other projection devices may be placed in the Rear Dining Area with the exception of on not more than twenty (20) days during any one calendar year when extraordinary sporting events (i.e., the World Series, the Super Bowl, etc.) may be shown on television sets temporarily placed in the Rear Dining Area.

(3)   Tenant's restaurant business in the demised premises shall be conducted in accordance with the same high standards of service, decor and ambiance as the restaurants known as Jim McMullens, located at 1341 Third Avenue, New York, New York, The "21" Club, located at 21 West 52nd Street, New York, New York, Runyons II, located at 932 Second Avenue, New York, New York, and Rusty's, located at 1271 Third Avenue, New York, New York.

(4)   The food served at the demised premises shall be of the nature and quality similar to the food served at Smith & Wolensky, located at 201 East 49th Street, New York, New York, Maxwell's Plum, located at 64th Street and First Avenue, New York, New York, Chez Louis, located at 1016 Second Avenue, New York, New York, and Rusty's, located at 1271 Third Avenue, New York, New York.  During lunch and dinner hours Tenant shall offer not less than eight (8) main courses and four (4) appetizers which are standard American food items none of which are American Southwest cooking.

(5)   In addition to the eight main courses and four appetizers referred to in subdivision 4 hereinabove, Tenant shall be permitted to have a limited portion of its menu designated to feature American Southwest cooking including such dishes as chicken fried steak, smoked barbecue baby-back ribs, pan-fried rainbow trout and barbecue short ribs.

(6)   During lunch and dinner hours, Tenant may serve food at the bar located in the demised premises provided that the menu from which such food is served contains only items which are also on the restaurant menu at that time.  During other than the normal lunch or dinner hours, Tenant may have a separate limited menu for the food served at the bar.

(D)   Tenant will conduct its operations in the Demised Premises so as to minimize annoyance or interference to occupants of the Building.  In furtherance of this covenant, Tenants will, at its own cost and expense and without limiting any of its other obligations under this lease:

(1)   maintain the necessary ducts, flue and exhaust system serving the demised premises and service and clean the same when required, including installation of proper filters;

(2)   when required during the Term, provide chemical treatment for the exhaust system, to Landlord's reasonable satisfaction, for the elimination of odors and fumes;

(3)   install and maintain filters, grease traps and other devices to prevent clogging of ducts, drains and sewers, and regularly clean and service same;

(4)   provide and maintain such other exhaust, cleaning or similar system which shall be necessary for the prevention of any smoke, fumes, odors or other

annoying substance from emanating from the demised premises to the annoyance of occupants of adjoining premises; and

(5) keep all rubbish, refuse and garbage in covered cans or receptacles until removal, and subject to Landlord's Rules and Regulations, provide for the daily removal (but only between the hours of 1:00 A.M. and 8:00 A.M.), by a reputable private carting company, in such manner as not to block the sidewalk or Building entrance at any time. No refuse, garbage cans or receptacles shall be allowed outside the demised premises between the hours of 8:30 A.M. and 1:00 A.M., except for temporary periods while awaiting pick-up. No garbage shall be commingled with that of any neighboring occupants or residents. All such rubbish, refuse and garbage shall be properly refrigerated, frozen, treated or packaged, to prevent odors from escaping.

(E) Tenant covenants and agrees that throughout the first three years of the Term, William Liederman and John C. Lowy shall be actively involved in the day to day conduct of Tenant's business at the demised premises and shall own not less than thirty (30%) percent in the aggregate (i) of all the issued and outstanding stock of Tenant or (ii) if the entity is not a corporation, of all the interest, directly or indirectly, of Tenant. During the fourth year of the Term, either of said individuals shall be actively involved in the day to day conduct of Tenant's business at the demised premises. During the fifth year of the Term, either of said individuals shall be actively and meaningfully involved in the conduct of Tenant's business at the demised premises but need not be present at the demised premises on a day-to-day basis. Throughout the initial five years of the Term, the individual or individuals required to be involved in the conduct of Tenant's business at the demised premises, as aforesaid, shall be a party to a management contract with Tenant which shall contractually obligate such individuals to manage Tenant's business at the demised premises.

(F) Tenant, at its expense, shall keep all entrances, vestibules and approaches within the demised premises free from all obstructions of every kind and from garbage, litter and refuse of every kind and in a clean, orderly and attractive condition.

(G) Tenant shall not create or permit any nuisance in the demised premises and shall not make or permit any noise or vibrations that is reasonably objectionable to other occupants of the Building, adjoining premises or to the public. Tenant shall keep the front windows and entrance door to the demised premises closed (but not locked) after 10:30 P.M. in order to minimize the noise emanating from the demised premises.

(H) Upon termination of this lease, or of Tenant's possession of the demised premises, Tenant shall surrender all keys of the demised premises to Landlord at the place then fixed for payment of Fixed Rent and shall make known to Landlord the combinations of all combination locks on safes, cabinets and files remaining in the demised premises.

(I) Notwithstanding anything to the contrary contained in Article 2 or subdivision (B)(2) of this Article 47, but subject, nonetheless, to Tenant's compliance with all the other terms, covenants and conditions of this lease (including, without limitation, the other provisions of this Article 47), Tenant may operate a first class French, Italian, sea-

-7-



food, continental (i.e., a combination of French, Italian and American food) or steak restaurant in the demised premises. Any such French restaurant shall have a quality of decor and food similar to that of 24 Fifth Avenue, located at 24 Fifth Avenue, New York, New York and Cafe Du Parc, located at 106 East 19th Street, New York, New York. Any such Italian restaurant shall have a quality of decor and food similar to that of Positano, located at 250 Park Avenue South, New York, New York, and Da Silvano, located at 260 Avenue of the Americas, New York, New York. Any such seafood restaurant shall have a quality of decor and food similar to that of The Manhattan Ocean Club, located at 57 West 58th Street, New York, New York, and The Sea Grill, located at 30 Rockefeller Center, New York, New York. Any such continental restaurant shall have a quality of decor and food similar to that of Maxwell's Plum, located at 64th Street and First Avenue, New York, New York, and Cafe des Artistes, located at 1 West 67th Street, New York, New York. Any such steak restaurant shall have a quality of decor and food similar to that of Smith & Wollensky Steak House, located at 201 East 49th Street, New York, New York, and Post House, located at 28 East 63rd Street, New York, New York.

(J)  Notwithstanding anything to the contrary contained in subdivision (B)(5) of this Article 47, Tenant may sell barbeque sauce and such baseball memorabilia as baseball books, shirts, caps, jackets, and autographed pictures of baseball players from the hat-check room or cashier (but not both) in the demised premises provided that, except as set form in Article 49(E) hereof, there shall be no advertising or other promotion whatsoever of such sales in any media including, without limitation, any signs in the windows of the demised premises. Tenant may, however, advertise the appearance of Mickey Mantle or other sports personalities in the demised premises.

(K)  Tenant may operate a limited corporate catering service from the demised premises subject to its compliance with all the applicable provisions of this lease and the following terms and conditions:

(1)  any single order accepted by Tenant shall be for not less than ten (10) meals;

(2)  the menu of such catering service shall be substantially similar to the menu offered by Tenant in the restaurant business conducted by it at the demised premises;

(3)  all deliveries with respect to such catering service shall be through the entrance to the demised premises on 58th Street and shall be made either by motorized van or by foot but, in no event whatsoever, shall bicycles be used to make deliveries for such catering service;

(4)  all orders must be placed with Tenant not less than twenty-four (24) hours prior to the time when they are to be delivered by Tenant;

(5)  the operation of such catering business, including, without limitation, deliveries therefrom, shall not adversely affect the operation of the florist located adjacent to the West 58th Street entrance to the demised premises; and

(6)  the personnel of such catering service (including, without limitation, the delivery personnel) shall not loiter on the street adjacent to the demised premises.

48. Tenant's Work

(A)  Supplementing Article 3, subject to Tenant's prior compliance with all applicable requirements of Article 3 hereof (including, without limitation, the prior submission to Landlord of plans and specifications for Landlord's prior written approval) and the Building Rules and Regulations Governing Tenant Alterations (currently as annexed hereto as Exhibit "C"), Landlord shall not unreasonably withhold or delay its consent to Tenant's performance of nonstructural alterations, improvements, additions, installations and decorations in and to the demised premises which have no adverse effect on the Building's operating systems or facilities (collectively, "Tenant's Work").

(B)  Tenant hereby designates William Liederman as its representative in connection with the performance of Tenant's Work.  Any notice, designation, selection and/or approval given by, or required of Tenant, shall be made by such representative and thereupon shall be binding upon Tenant.  Tenant may change such designation by notice given in accordance with this Lease.

(C)  Tenant's Work performed to initially renovate the demised premises for Tenant's occupancy shall result in a layout and manner of installation of Tenant's bar and restaurant (including, without limitation, the approximate location of permitted television sets) in the demised premises substantially in accordance with the plan annexed hereto as Exhibit E as same may be modified by the provision of Article 57(B).  Such layout and manner of installation may not be materially altered during the Term without Landlord's prior approval, which shall not be unreasonably withheld or delayed.  It is understood that, with respect to Exhibit E, the approximate location of the televisions or other visual projections is indicated, although, in no event shall any television sets or other visual projections be located closer than ten feet from the front windows of the demised premises. All such television sets or visual projections must be installed so as to be~either enclosed or~built into the walls and other furniture (e.g., bar) located in the demised premises to create a ~closed-in and~ ~openly~ finished appearance.  No television set or visual projection shall be~up to three~ ~suspended by poles or similar devices from the ceiling or placed on tables (except for~ ~the one~ television sets~or visual projections allowed in the Rear Dining Area pursuant to Article 47(C)(2) which may be placed on a table or other appropriate furniture).

49. Show Windows, Signs

(A)  Tenant shall wash the windows of the demised premises at least once per calendar month and shall not paste or otherwise attach any signs thereto (except as set forth in subdivision (E) hereof).

(B)  All of Tenant's furniture, equipment and other personal property which is visible from the street adjacent to the demised premises shall be maintained to Landlord's satisfaction in good condition and appearance and suitable for a restaurant located in a first-class apartment building.

(C)  (1)  Tenant agrees not to erect or place any sign (except as set forth in subdivision (E) hereof), gate, awning, canopy or other projection upon or at the demised premises or the Building, or in any window of the demised premises, without first obtaining written consent thereto from Landlord.  Tenant agrees to obtain any required governmental license, approval or permit for same prior to erecting or

-9-



placing any such sign, gate, awning, canopy or projection and shall maintain such license, approval or permit in effect during the Term.

     (2)  Landlord shall not unreasonably withhold its consent to Tenant's installation, at Tenant's sole cost and expense, of a canopy from the existing entrance door of the demised premises on Central Park South to the curb and an awning over the windows (not extending out over ~~three~~ feet if there is no sidewalk cafe and not extending out over ~~five~~ feet if there is a sidewalk cafe). Such canopy shall contain only the name of Tenant's restaurant at the demised premises and not any symbols or other pictures and shall be in harmony with the Building. Landlord's reasonable approval shall be required for the color, material and design of such canopy. Landlord agrees to cooperate with Tenant, at Tenant's expense, in obtaining all necessary governmental approvals for such canopy and awning.

    (D)  If any sign, gate, awning, or canopy at the demised premises is required to be removed to permit Landlord to make a structural repair or cure any violation or otherwise, Tenant agrees to remove such sign, gate, awning, or canopy at Tenant's sole expense.

    (E)  Notwithstanding anything to the contrary in the foregoing:

     (1)  Tenant may place the name and logo of the restaurant business conducted by it at the demised premises on the storefront window and marble facade of the demised premises subject to Landlord's reasonable approval of the location, design, size, color and material of such sign and logo;

     (2)  Tenant may place a professionally prepared sign in a permanent frame, of a size not larger than twenty (20) inches by twenty-four (24) inches, in the window of the demised premises which shall announce any sports attractions being shown on the television sets in the demised premises and/or the personal appearance of Mickey Mantle or other sports personalities in the demised premises. In no event whatsoever shall such sign be hand-lettered and, in the event Tenant places any hand-lettered sign in the window of the demised premises more than once in any calendar year, the provisions of this subdivision (E)(2) shall be of no further force and effect and Tenant shall thereafter no longer be permitted to place the foregoing sign in the window of the demised premises; and

     (3)  Tenant may place in the window of the demised premises (i) its menu, (ii) any permits which, pursuant to applicable law, are required to be exhibited in the window of the demised premises and (iii) no more than four (4) reviews of Tenant's restaurant (which reviews shall not be enlarged in the aggregate beyond 8 1/2 inches by 11 inches).

50.  Permits

    All licenses, permits or other approvals required by any municipal, State or Federal agency, department or bureau having or asserting jurisdiction in connection with Tenant's use or occupancy of the demised premises shall be obtained by Tenant at its sole cost and expense. If requested by Tenant, Landlord shall cooperate with Tenant, at Tenant's sole cost and expense, in obtaining any such licenses, permits or approvals.

51.  **Plumbing Repairs**

Tenant agrees that it will pay any and all expenses of plumbing or related costs as well as all costs due to floods and pipe blockages caused by use of the demised premises and/or the business conducted by Tenant unless the same was due to the negligence of Landlord or Landlord's agents. Tenant agrees to maintain, at Tenant's sole cost and expense, the slop sinks, strainers and other related equipment, located in the demised premises in a clear and obstructed mannner and to take all steps necessary and possible to keep the demised premises free from odors, leaks, spillage, floods and vermin resulting therefrom.

52.  **Additional Provisions Relating to Security Deposit**

Supplementing Article 31:

(A)  Tenant may, at the execution of this lease or any time during the Term, substitute for the then Security Deposit, an irrevocable letter of credit ("LC") issued by a New York City commercial bank, or drawable upon a New York City commercial bank, in the amount of the Security Deposit and having the same substantive effect as the form of the letter of credit annexed hereto as Exhibit D.

(B)  Tenant may also, at any time during the Term, substitute the LC for a cash deposit to be held by Landlord, in which event the Security Deposit shall be invested in an interest bearing account and all interest thereon (less any statutory administrative fee, which shall be retained by Landlord) shall be remitted to Tenant annually.

(C)  Tenant's right to receive any interest on the Security Deposit shall be conditioned upon Tenant not being then in default (beyond any applicable grace period) in the performance of any of its obligations under this lease.  Any such interest retained by Landlord shall be applied against the Fixed Rent or additional rent due hereunder.

(D)  Notwithstanding anything to the contrary in the foregoing, provided Tenant is not then in default hereunder, effective August 1, 1989, August 1, 1990 and August 1, 1991, the Security Deposit shall be reduced by $20,000.00 on each such date.

53.  **Deliveries**

Subject to Landlord's Rules and Regulations, all deliveries to the demised premises are to be made through the entrance to the demised premises on 58th Street.

54.  **Room Service**

Tenant shall, during its normal business hours until one hour prior to the closing of Tenant's kitchen, provide room service to all residents of the Building at reasonable charges therefor (which may include a nominal surcharge for such room service).  Tenant shall not be required to provide any linens, utensils or china as part of such room service.

55.  **Tenant's Fixtures**

(A)  All of Tenant's fixtures and equipment installed in and attached to the demised premises shall be fully paid for by Tenant on or before their installation and shall be free and clear of all liens, encumbrances and security and title retention agreements of any kind.

(B)  Except as and to the extent Landlord elects other-wise by notice to Tenant given within twenty (20) days after the Expiration Date or sooner termination of this lease, all of Tenant's permanent fixtures and equipment (such as, with-out limitation, the bar, refrigerators, sinks, stores and dishwashers) installed in the demised premises shall be deemed Landlord's property and surrendered to Landlord in good condition and repair.

56.  **Assignment, Etc.**

Supplementing Article 11:

(A)  Tenant shall neither:  (1) publicly advertise for the assignment, subletting  or occupancy of all or any part of the demised premises at a rental rate less than the rental rate at which Landlord is then offering to lease comparable space in the Building; or (2) assign this lease to or sublet to or permit the occupancy of all or any part of the demised premises by any other party which is then a commercial tenant, subtenant, licensee or occupant of any space in the Building or which has negotiated with Landlord for space in the Building within the three (3) month period preceding the date of Landlord's receipt of Tenant's Notice pursuant to subdivision (B).

(B)  If Tenant wishes to assign this lease, sublet all (but not less than all) of the demised premises or permit the demised premises to be occupied by any other party, Tenant first shall so notify Landlord ("Tenant's Notice"), specify-ing the name of the proposed assignee, subtenant or occupant, the name of and character of its business, the terms of the proposed assignment, sublease or occupancy (including, with-out limitation, the commencement and expiration dates there-of) and current information as to the financial responsi-bility and standing of the proposed assignee, sublessee or occupant and shall provide Landlord with such other informa-tion as it reasonably requests.  A transfer of more than a fifty percent (50%) beneficial interest in Tenant, whether such transfer occurs at one time, or in a series of related transactions, and whether of stock, partnership interest or otherwise, by any party in interest being deemed an assign-ment of this lease; however, Tenant may transfer up to sixty percent (60%) of such interest without such transfer being deemed an assignment hereunder, provided either William Liederman or John C. Lowy shall continue to be actively involved in the day to day conduct of Tenant's business at the demised premises and, in the event both cease to be so actively involved, such event shall be deemed on assignment hereunder and the Security Deposit shall be increased to $125,000.00 pursuant to the provisions of subdivision (I) of this Article 56 and the effective date of such assignment shall be the commencement date for purposes of calculating the subsequent reductions in the Security Deposit as provided in subdivision (I).

(C)  Landlord shall not unreasonably withhold its con-sent to a proposed assignment, sublease or occupancy of all (but not less than all) of the demised premises which is to

-12-



take effect on or after August 1, 1990, but such consent
shall be deemed of no effect if such assignment, sublease or
occupancy is not consummated upon substanially the terms set
forth in Tenant's Notice and within sixty (60) days after
such consent is given.

(D)  No assignment of this lease shall be effective
unless and until Tenant delivers to Landlord duplicate origi-
nals of the instrument of assignment (wherein the assignee
assumes the performance of Tenant's obligations under this
lease) and any accompanying documents.

(E)  No sublease of the demised premises shall be effec-
tive unless and until Tenant delivers to Landlord duplicate
originals of the instrument of sublease (containing the pro-
vision required by subdivision (F)) and any accompanying
documents.  Any such sublease shall be subject and subor-
dinate to this lease.

(F)  Any such sublease shall contain substantially the
following provisions:

       (1)  "In the event of a default under any
underlying lease of all or any portion of the prem-
ises demised hereby which results in the
termination of such lease, the subtenant hereunder
shall, at the option of the lessor under any such
lease ("Underlying Lessor"), attorn to and recog-
nize the Underlying Lessor as landlord hereunder
and shall, promptly upon the Underlying Lessor's
request, execute and deliver all instruments neces-
sary or appropriate to confirm such attornment and
recognition.  Notwithstanding such attornment and
recognition, the Underlying Lessor shall not (a) be
liable for any previous act or omission of the
landlord under this sublease, (b) be subject to any
offset, not expressly provided for in this sub-
lease, which shall have accrued to the subtenant
hereunder against said landlord, or (c) be bound by
any modification of this sublease or by any prepay-
ment of more than one month's rent, unless such
modification or prepayment shall have been
previously approved in writing by the Underlying
Lessor.  The subtenant hereunder hereby waives all
rights under any present or future law to elect, by
reason of the termination of such underlying lease,
to terminate this sublease or surrender possession
of the premises demised hereby."

       (2)  "This sublease may not be assigned or the
premises demised hereunder further sublet, in whole
or in part, without the prior written consent of
the Underlying Lessor."

(G)  Landlord's consent to any assignment or sublease
shall neither release Tenant from its liability for the
performance of Tenant's obligations hereunder during the
balance of the Term nor constitute its consent to any (1)
further assignment of this lease or of any permitted sublease
or (2) further sublease of all or any portion of the premises
demised hereunder or under any permitted sublease.  If a
sublease to which Landlord has consented is assigned or all
or any portion of the premises demised thereunder is sublet
without the consent of Landlord in each instance obtained,
Tenant shall immediately terminate such sublease, or arrange
for the termination thereof, and proceed expeditiously to
have the occupant thereunder dispossessed.

(H)  Tenant shall pay to Landlord, promptly upon demand therefor, all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Landlord in connection with any assignment of this lease or sublease of all or any part of the demised premises.

(I)  If Tenant assigns this lease or subleases or permits the occupancy of the demised premises, then effective as of the commencement date of such assignment, sublease or occupancy, and as a condition to the effectiveness thereof, the Security Deposit shall be increased to $125,000.00. Thereafter, provided Tenant is not in default hereunder, effective on the second, third and fourth anniversaries of the commencement date of such assignment, sublease or occupancy, the Security Deposit shall be reduced by $20,000.00 on each such date.

(J)  Notwithstanding anything contained in this lease to the contrary and subject to all the applicable provisions of this lease, Tenant shall have a one-time right, for a period of ~~sixty days~~ six months from the date hereof, to assign this lease to an entity in which William Liederman and John R. Lowy own not less than thirty (30%) percent in the aggregate (i) of all the issued and outstanding stock of Tenant or (ii) if the entity is not a corporation, of all the interest, directly or indirectly of such entity, provided both individuals shall be actively involved in the day to day conduct of Tenant's business at the demised premises.

(K)  Notwithstanding anything contained in this Article 56 to the contrary, Landlord hereby consents to the collateral assignment of this lease back to Tenant, as security, in the event of a permitted assignment of this lease by Tenant pursuant to a sale of Tenant's business, and such collateral assignment shall not be subject to the provisions of Subdivision I of this Article 56.

57.  Garden Area; Sidewalk Cafe

(A)  Tenant shall, at it sole cost and expense, maintain in good order and repair the garden area shown on Exhibit A annexed hereto and keep the same properly planted to the reasonable satisfaction of Landlord.  Tenant may not, however, use said garden area for seating or for the service of any food or beverage.

(B)  Subject to Tenant's obtaining and maintaining in effect all governmental approvals and permits required therefor and its compliance with the applicable provisions of this lease with respect thereto (including, without limitation, Article 47 hereof), Tenant shall be permitted to operate a sidewalk cafe in front of the demised premises similar in nature of operation and appearance to the sidewalk cafes of Cafe de la Paix located at 50 Central Park South, New York, New York and The Stanhope, located at 995 Fifth Avenue, New York, New York.  Landlord, at Tenant's sole expense, shall cooperate with Tenant in obtaining any such necessary governmental approvals and permits.  Notwithstanding anything to the contrary in the foregoing, Tenant shall not affix any objects (including, without limitation, planters, tables or chairs) to the sidewalk in front of the Building in connection with such sidewalk cafe.  Such sidewalk cafe shall not remain open for business after 10:30 P.M.

-14-



## 58.  Brokerage

Tenant represents to Landlord that Tenant, its agents and its representatives have dealt only with Joseph Hilton & Associates Incorporated and Alan M. Simon, Inc. as brokers (collectively, "Broker") in connection with this lease. Landlord shall pay the Broker's commission therefor pursuant to separate agreement.  Tenant shall indemnify Landlord against any liability and expense (including reasonable attorney's fees) for any other brokerage commission or finder's fee based on any misrepresentation by Tenant in this Article 58.  Tenant's liability hereunder shall survive any expiration or termination of this lease.

## 59.  Limitation of Liability

Anything herein to the contrary notwithstanding, Landlord's liability for its negligence or failure to perform its obligations hereunder shall be limited to its interest in the Land and Building.  Tenant shall neither seek to enforce nor enforce any judgment or other remedy against any other asset of Landlord or any party who holds any interest in Landlord.

## 60.  Submission to Jurisdiction, Etc.

This lease shall be deemed to have been made in New York County, New York, and shall be construed in accordance with the laws of the State of New York.  All actions or proceedings relating, directly or indirectly, to this lease shall be litigated only in courts located within the County of New York.  Tenant, any guarantor of the performance of its obligations hereunder ("Guarantor") and their successors and assigns hereby subject themselves to the jurisdiction of any state or federal court located within such county.

Whenever any default by either party hereto causes the other party to incur attorneys' fees and/or any other costs or expenses, the defaulting party agrees that it shall pay and/or reimburse the other party for such reasonable fees, costs or expenses within ten (10) days after being billed therefor.

If any monies owing by Tenant under this lease are paid more than fifteen (15) days after the date such monies are payable pursuant to the provisions of this lease, Tenant shall pay Landlord interest thereon, at a rate equal to four (4%) per cent in excess of the "prime rate" of The Chase Manhattan Bank, N.A., for the period from the date such monies were payable to the date such monies are paid.

The submission of this lease to Tenant shall not constitute an offer by Landlord to execute and exchange a lease with Tenant and is made subject to Landlord's acceptance, execution and delivery thereof.

## 61.  Modifications Requested by Mortgagee

If any prospective mortgagee of the Land, Building or any leasehold interest therein requires, as a condition precedent to issuing its loan, the modification of this lease in such manner as does not materially lessen Tenant's rights or increase its obligations hereunder, Tenant shall not delay or withhold its consent to such modification and shall execute and deliver such confirming documents therefor as such mortgagee reasonably requires.

62.   "As Is"

   Supplementing Article 21, the demised premises shall be
leased to Tenant in their "as is" condition on the Commence-
ment Date and Landlord shall not be required to perform any
work to prepare the demised premises for Tenant's occupancy.


63.   Insurance

   During the Term Tenant shall pay for and keep in force
general liability policies in standard form protecting
against any and all liability occasioned by accident or
occurrence, subject to customary exclusions, such policies to
be written by recognized and well-rated insurance companies
authorized to transact business in the State of New York, in
the amount of $2,000,000.00 in respect to injuries to any one
or more persons and $1,000,000.00 for property damage.  If at
any time during the Term it reasonably appears to Landlord
that public liability or property damage limits in the City
of New York for premises similarly situated, due regard being
given to the use and occupancy thereof, are higher than the
foregoing limits, then Tenant shall increase the foregoing
limits accordingly.  Landlord shall be named as an additional
insured in the aforesaid insurance policies and the policies
shall provide that Landlord shall be afforded thirty days
prior notice of cancellation of said insurance.  Tenant shall
deliver certificates of insurance evidencing such policies.
All premiums and charges for the aforesaid insurance shall be
paid by Tenant and if Tenant shall fail to make such payment
when due, Landlord may make it and the amount thereof shall
be repaid to Landlord by Tenant on demand and the amount
thereof may, at the option of Landlord, be added to and
become a part of the additional rent payable hereunder.
Tenant shall not violate or permit to be violated any condi-
tion of any of said policies and Tenant shall perform and
satisfy the requirements of the companies writing such
policies.


64.   Bankruptcy

   Without limiting any of the provisions of Articles 16,
17 or 18 hereof, if pursuant to the Bankruptcy Code of 1978,
as the same may be amended, Tenant is permitted to assign
this lease in disregard of the restrictions contained in
Articles 11 and 56 hereof, Tenant agrees that adequate assur-
ance of future performance by the assignee permitted under
such Code shall mean the deposit of cash security with Land-
lord in an amount equal to the sum of one year's Fixed Rent
then reserved hereunder plus an amount equal to all addi-
tional rent payable under Article 41 or other provisions of
this lease for the calendar year preceding the year in which
such assignment is intended to become effective, which
deposit shall be held by Landlord, with interest, for the
balance of the Term as security for the full and faithful
performance of all of the obligations under this lease on the
part of Tenant yet to be performed.  If Tenant receives or is
to receive any valuable consideration for such an assignment
of this lease, such consideration, after deducting therefrom
(A) the brokerage commissions, if any, and other expenses
reasonably incurred by Tenant for such assignment and (B) any
portion of such consideration reasonably designated by the
assignee as paid for the purchase of Tenant's property in the
demised premises, shall be and become the sole and exclusive
property of Landlord and shall be paid over to Landlord
directly by such assignee.  In addition, adequate assurance
shall mean that any such assignee of this lease shall have a

-16-

net worth, exclusive of good will, equal to at least fifteen (15) times the aggregate of the Fixed Rent reserved hereunder plus all additional rent for the preceding calendar year as aforesaid.

## 65.  Estoppel Certificate

Each party hereto at any time, and from time to time, upon at least fifteen (15) days' prior notice by the other party ("Requesting Party") shall execute, acknowledge and deliver to the Requesting Party, and/or to any other person, firm or corporation specified by the Requesting Party ("Recipient"), a statement certifying that this lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates to which the Fixed Rent and additional rent have been paid, stating whether or not there exists any defaults by the Requesting Party under this lease, and, if so, specifying each such default and any other matters reasonably requested by the Requesting Party or the Recipient.

## 66.  Holdover

In the event Tenant shall hold over after the expiration of the Term, the parties hereby agree that Tenant's occupancy of the demised premises after the expiration of the Term shall be upon all of the terms set forth in this lease except Tenant shall pay as rent for the holdover period an amount equal to the higher of (A) an amount equal to two times the sum of (1) the pro rata Fixed Rent payable by Tenant during the last year of the Term and (2) all monthly installments of additional rent payable by Tenant pursuant to the terms of this lease that would have been billable monthly by Landlord had the Term not expired; or (B) an amount equal to the then market rental value for the demised premises as shall be established by Landlord giving notice to Tenant of Landlord's good faith estimate of such market rental value.

## 67.  (Intentionally Omitted)

## 68.  Limitation on Rent

If on the Commencement Date, or at any time during the Term, the Fixed Rent or additional rent reserved in this lease is not fully collectible by reason of any Federal, State, County or City law, proclamation, order or regulation, or direction of a public officer or body pursuant to law (collectively, "Law"), Tenant agrees to take such steps as Landlord may legally request to permit Landlord to collect the maximum rents which may be permissible from time to time during the continuance of such legal rent restriction (but not in excess of the amounts reserved therefor under this lease).  Upon the termination of such legal rent restriction, Tenant shall pay to Landlord, to the extent permitted by Law, an amount equal to (A) the Fixed Rent and additional rent which would have been paid pursuant to this lease but for such legal rent restriction, less (B) the Fixed Rent and additional rent paid by Tenant to Landlord during the period such legal rent restriction was in effect.



FOOTNOTES ATTACHED TO AND FORMING PART OF LEASE DATED AS OF
AUGUST 1, 1987 BETWEEN 40 CENTRAL PARK SOUTH, INCORPORATED,
__LANDLORD, -and- LIEDERMAN/LOWY VENTURES, INC., TENANT__

1.   Subject to the provisions of Article 47 hereof,

2.   , which approval shall not be unreasonably withheld or
     delayed provided the use of such contractors or
     mechanics will not result in labor discord at the
     Building.  The foregoing shall not, however, apply to
     plumbing or gas systems contractors.

3.   reasonably

4.   twenty (20)

5.   or otherwise

5A.  the expiration of the Term

6.   As to any alteration permitted to be made by Tenant
     pursuant to this lease, Tenant shall not be required to
     remove such alteration at the expiration of the Term
     unless, when granting its consent to such alteration,
     Owner informs Tenant that the same will be required to
     be removed upon the expiration of the Term.

7.   In no event, however, shall Tenant be obligated to
     repair any damage resulting·from the improper act,
     improper omission or negligence of Owner, Owner's agents
     or Owner's employees.

8.   Notwithstanding the foregoing, all damage or injury to
     the demised premises or any other part of the Building,
     or to its fixtures, equipment and appurtenances, whether
     requiring structural or non-structural repairs caused by
     or resulting from the improper acts, improper omissions
     or negligence of Tenant, Tenant's servants, employees,
     or licensees, or any such damage to the demised premises
     caused by Tenant's invitees, shall be repaired promptly
     by Tenant at its sole cost and expense to the reasonable
     satisfaction of Owner.  Tenant shall also repair all
     damage to the Building and the demised premises caused
     by moving of Tenant's fixtures, furniture or equipment.
     All of the aforesaid repairs shall be of a quality or
     class equal to the original work or construction.  If
     Tenant fails after ten days' written notice to proceed
     with due diligence to make repairs required to be made
     by Tenant, the same shall be made by Owner at the
     expense of Tenant and the expenses thereof incurred by
     Owner shall be collectible as additional rent after
     rendition of a bill or a statement therefor.  Tenant
     shall not be required (a) to make any structural
     repairs, (b) to make any sprinkler installations,
     repairs or modifications, or (c) comply with any
     requirements of law or the board of fire underwriters
     which pertain to structural repairs unless the condition
     necessitating such installations, repairs or modifica-
     tions shall be caused by the acts or omissions of
     Tenant, Tenant's servants, employees, invitees or
     licensees or by Tenant's manner of use of the demised
     premises.  All other structural repairs shall be made by
     Owner.  Unless damaged by the acts or omissions of
     Tenant, its servants, employees, invitees or licensees,
     it shall be the responsibility of Owner to make repairs
     to the plumbing, heating and electrical lines leading
     to, but not within, the demised premises.



## 69. Acceptance of Keys

If Landlord or Landlord's managing or rental agent accepts from Tenant one or more keys to the demised premises in order to assist Tenant in showing the demised premises for subletting or other disposition or for the performance of work therein for Tenant or for any other purpose, the acceptance of such key or keys shall not constitute an acceptance of a surrender of the demised premises nor a waiver of any of Landlord's rights or Tenant's obligations under this lease including, without limitation, the provisions relating to assignment and subletting and the condition of the demised premises.

## 70. Identification of the Demised Premises

Tenant shall not use the address 40 Central Park South in any advertising, stationery or in any other manner to identify the address of the demised premises. Tenant shall use the address 44 Central Park South, New York, New York.

## 71. Abatement in Fixed Rent

20

Notwithstanding anything to the contrary in the foregoing, Fixed Rent shall be abated through February 19, 1988.

## 72. Scaffolding

Landlord represents that it currently has no plans to perform any work which would require the installation of scaffolding in front of the demised premises. In the event any such scaffolding is hereafter placed in front of the demised premises, Landlord shall permit Tenant to install, at Landlord's expense, a sign containing the name of Tenant's restaurant operated at the demised premises on such scaffolding. In the event Landlord, with respect to work being done to the Building, causes scaffolding to be placed in front of the demised premises and such scaffolding remains in place for more than five months, Tenant shall be entitled to a pro-rata rent abatement, commencing with the sixth month until such scaffolding is removed, in an amount not to exceed $2,500 per month, based on the loss in income suffered by Tenant in its business at the demised premises, which loss shall be certified to Landlord by Tenant's independent public accountant or chief financial officer, in accordance with generally accepted accounting principles, consistently applied; showing comparison income figures for the corresponding period of business in the immediate prior year (or for the most comparable period available if Tenant has been in business for less than a full year).

## 73. Definitions of "Landlord" and "Owner"

The terms "Owner" and "Landlord", whenever used in this lease (including, without limitation, in Article 33), shall have the same meaning.

## 74. Lobby Entrances

(A) Subject to Tenant obtaining all or any governmental approvals, including, without limitation, compliance with applicable fire code requirements, Landlord hereby consents

-18-

to the closure by Tenant, at Tenant's expense, of the existing entrance to the demised premises located in the front part of the lobby of 40 Central Park South, provided the resultant space facing the lobby is restored as a wall and the stairway is removed and such space is also restored as a wall, all in a manner and quality satisfactory to Landlord.

Such work will be performed in accordance with all the applicable provisions of this lease and the Rules and Regulations Governing Tenant Alterations.

(B)  Tenant agrees, that as part of the foregoing work to be performed pursuant to Subdivision A of this Article 74, Tenant shall, at Tenant's expense, install and maintain adjacent to the fire exit door leading from the demised premises to the rear part of the lobby of 40 Central Park South, a door bell or buzzer system operable from the lobby side to permit tenants of the Building to announce their desire to enter the demised premises from said lobby.  Tenant agrees to promptly admit any such tenant utilizing such bell or buzzer system.

9.   , contractors,

10. damaged portion of the premises and any other portion as to which Owner requires access in order to perform repairs

11. In the event of damage or destruction to the demised premises by fire or other casualty (collectively, "Casualty") and Owner's failure to restore the demised premises to their condition immediately prior to the Casualty within twelve (12) months after the occurrence of the Casualty (as such twelve (12)-month period may be extended by force majeure or other circumstances beyond Owner's reasonable control, but in no event longer than for an additional six (6) months), Tenant may terminte this lease by notice given to Owner within twenty (20) days after the expiration of such twelve (12)-month period (as the same may be extended), time being of the essence.  In such event this lease shall terminate as of the date such notice is given, Fixed Rent and other amounts payable under this lease shall be apportioned as of the date of the Casualty and the parties shall have no further liability hereunder.

12. upon reasonable prior notice to Tenant (which notice may be given orally) during Tenant's normal business hours unless otherwise requested by Tenant, with a minimum of inconvenience to Tenant,

13. beyond the applicable notice period provided in Article 17 hereof

14. and installation and maintenance thereof shall not materially and adversely interfere with Tenant's use of the demised premises

15. and upon reasonable prior notice to Tenant (which notice may be given orally)

16. In the event of an emergency only, if

17. Annexed hereto as Exhibit F is a true and correct copy of the Certificate of Occupancy of the Building.

18. thirty (30)

19. fifteen (15)

20. after five (5) days written notice to Tenant from Owner stating that such payment is past due

21. further

22. or Tenant

23. upon the expiration of fifteen (15) days notice to Tenant and Tenant's failure to cure such default, or to commence curing such default if such default is of the nature that it cannot be completely cured within such fifteen (15) day period,

24. , damage from casualty and damage that Owner is obligated to repair pursuant hereto

25.  or Tenant

26.  belonging to Tenant

27.  as a result of the use or occupancy of the demised premises by Tenant, or

27A. as this lease is in full force and effect

28.  reasonable

29.  , provided, however, in the case of any conflict or inconsistency between the provisions of this lease and of any Rules and Regulations as originally or hereafter adopted, the provisions of this lease shall control.

30.  as provided in Article 27.

31.  twenty (20)

32.  If Tenant notifies Owner that another commercial or store tenant in the Building is violating the Rules and Regulations and that such violation materially and adversely interfere with Tenant's use and enjoyment of the demised premises, Owner agrees to require such other commercial or other tenant to discontinue such violation, and if necessary, agrees to commence legal proceedings to compel such discontinuance, provided Tenant agrees in writing at the time of making such request to indemnify and save harmless Owner from any cost, including legal fees and disbursements, and any claims for damages should Owner be unsuccessful in such legal proceedings.

33.  Tenant

34.  If Tenant does not replace such broken or damaged glass within twenty-four (24) hours after the damage or fails to reasonably secure the demised premises after such glass is broken or damaged, Owner shall replace such glass at Tenant's expense.



Central Park South

40 Central Park South
Ground Floor Plan

EXHIBIT A

Public Corridor

All Areas, Dimensions
And Conditions
Are Approximate

Garden Area

40 Central Park South
Cellar Plan

Compressor Room

Public Corridor

A.C. Fan Room

40 C.P.S.

41 W. 58th Street

RAMP

UP TO STREET

EXHIBIT B

All Areas, Dimensions
And Conditions
Are Approximate

EXHIBIT C

**40 CENTRAL PARK SOUTH**                     Revised 11/10/80

**RULES & REGULATIONS GOVERNING TENANT ALTERATIONS**

I.   a) Complete architectural, mechanical, and structural drawings
         must be submitted to the Owner/Landlord and/or Managing
         Agent ("Owner"/"Landlord") of the building prior to the
         commencement of work ("Work"). Where new or altered work affects the
         building's mechanical, electrical, or structural facilities,
         the tenant's drawings will be referred to the owner's
         consulting engineers for review. The/cost of such review
         reasonable
         shall be borne by the tenant.

     b) Tenant agrees further to comply with all/changes and require-
         reasonable
         ments that may be recommended by Landlord and/or its
         consultant.

     c) Tenant shall be responsible for any disturbance or deficiency
         created in the air conditioning or other mechanical,
         electrical, or structural facilities within the building as
         a result of the alteration. If such disturbances or
         deficiency results, it shall be the tenant's responsibility
         to correct the resulting conditions and restore the services
         reasonable
         to the complete/satisfaction of the owner, his architect
         and engineers.

     d) The tenant will provide one complete set of reproducible
         drawings and three sets of black and white prints to the
         owner at the tenant's cost and expense.

     e) A complete list of all contractors (general contractor and
         subcontractors) must be submitted to the Landlord for its
         approval prior to the commencement the Work.

     f) All work involving plumbing and gas systems within the building
         must be accomplished by the building's service contractor
         and gas
         whose prices shall be competitive with other plumbing/con-
         tractors, as the case may be, in the borough of Manhattan.*

II.  All workmanship and materials furnished shall comply with
     applicable lease provisions and shall be equal to the standards
     of the building. (Building Standard Installations Specs are
     available upon request.) The Work shall be performed at the

*If such contractor's price is not competitive, it shall be retained by Tenant
merely to supervise the work, which shall be performed by Tenant's contractor
reasonably acceptable to Landlord.

tenant's sole cost and expense. The owner shall have no responsibility for or in connection with the Work and you will remedy at your sole cost and expense and be responsible for any and all defects in all Work that may appear during or after the completion thereof whether the same shall affect premises in particular or any parts of the building in general.

III.  a) The Work shall comply with the rules and regulations of the city, state and federal government agencies having jurisdiction. Tenant's architect and contractor shall file drawings and have them stamped approved, and secure all permits and amendments for controlled inspection in compliance with the present rules of the Department of Buildings, prior to the commencement of any work. Original copies of all Department of Buildings approved documents and drawings are to be submitted to owner prior to the commencement of the Work.

b) Should the tenant wish to file Building Department documents under Directive 14 (Architect or Professional Engineer to be responsible for controlled inspections and final sign-off) in lieu of Building Department Inspections, we will require a brief resume indicating the qualifications of the architect or professional engineer retained by the tenant for such work. The owner, upon satisfactory review of these qualifications, will sign the necessary inspection authorization to be filed with the Building Department (B Form 23).

IV.  Before commencement of Work, tenant's general contractor and/or subcontractor shall furnish to the owner Certificates of Workmen's Compensation Insurance and Certificates of Comprehensive Liability and Property Damage Insurance on an occurrence basis covering all men employed in the execution of the contract, including those of all subcontractors in a combined limit of Liability of $2,000,000, or a combined limit of Liability of $1,000,000, and a minimum Umbrella of $1,000,000.

Contractors insurance to include Contractual Liability and Completed Operations coverage.

In addition, the general contractor must submit to the owner the following Indemnify and Save Harmless Clause:

> "We indemnify and save harmless the owner and its managing agent against loss or expense by reason of liability imposed by law upon the owner and agent because of bodily injuries, including death, at any time resulting therefrom, accidentally sustained by any person or persons or on account of damage to property arising out of or in consequence of the performance of the contract whether such injuries to persons or damage to property are due to or claimed to be due to any negligence of the contractors, the tenants, the owners, their employees or agents or any other persons. We will repair or replace, or at owner's election reimburse owner for the cost of repairing or replacing, any portion of the owner's real or personal property so damaged, lost, or destroyed in the performance of this work."

All insurance certificates are to be made out to the owner of the building and/or the managing agent with notice given 15 days in advance if cancelled or modified.

V.  The tenant and/or tenant's contractors shall submit the following drawings and certificates to the owner upon completion of Work:

1.  As built drawings for all partitioning, lighting, outlets, air conditioning ductwork and diffusers, and plumbing.

2.  Approvals issued by the Department of Buildings or Professional Engineer/Architect, stamped by the Department of Buildings.

3.  Electrical certificates issued by the Department of Water Resources, Bureau of Water Register and the Board of Fire Underwriters.

VI.  a)  Tenant and its contractors or materialmen shall comply with the rules and requirements of the building.

b)  ~~Elevator use for handling construction material, equipment~~, and debris will be restricted Monday ~~through~~ Friday to the hours before 7:00 ~~a.m.~~ and after 7:00 p.m., Saturdays after ~~1:00 p.m. and all day~~ Sunday.  Specific arrangements for such elevator use must be made in advance with the Building. Operations Manager, ~~at Atco Properties & Management~~

~~Administration office.   Tenants shall be required to pay~~
~~for the use of elevators.~~

c) If any of the Work being done shall cause/ unreasonable excessive noise and
disturbance to any other tenant, said work shall be stopped
immediately on the advice of the Building Operations Manager
and completed only at his/discretion. reasonable

d) When demolition or construction is in progress, every
precaution shall be taken to prevent any dust, odors from
escaping to adjacent tenant areas, building corridors, or
mechanical areas.

e) All construction debris must be kept inside the tenant area
until removed from the job site.  No stock piling or
debris that constitutes a fire hazard will be allowed.

f) Where openings on Public Corridor Walls are made, the
General Contractor will provide suitable protection to
insure against dust and interference with other tenants.

g) All demolition and rubbish removal must be done after
9:00 a.m. and before 5:00 p.m. on business days Monday
through Friday,

h) All tradesmen/materialmen are to follow/specific instructions reasonable
from both the Chief Engineer and Operations Manager of the
building with regard to building systems and operations.

i) The Public Corridors will be protected by the laying of
Kraft Paper and taped down, to the satisfaction of the
Building Operations Manager and thereafter maintained in a
clean and safe condition for the duration of the con-
struction, then removed and corridors thoroughly cleaned.

j) The delivery and handling of materials, equipment, and
debris must be arranged to avoid any/inconvenience and unreasonable
annoyance to other tenants.

k) The approved copy of the plans (stamped and approved by
the Department of Buildings) shall be kept on the premises
(Chief Engineer's Office), available for the inspectors
at all times.

VII. Before the commencement of the Work, a copy of the executed contract or contracts covering all lienable items must be submitted to the Landlord. With Landlord's acceptance of all plans, specifications, and other documents required herein, the Landlord (since Waivers of the right to file Mechanic's Liens by contractors is no longer permitted in New York State) will require either of the following:

1. A deposit of monies in the amount of Landlord's reasonably estimated cost of Tenant's Alteration (less any downpayment, not to exceed 25% of the contract price) paid by Tenant under its contract for the Work, excluding furniture, carpeting, non-lienable furnishings and other non-lienable items ("Cost"), which shall be held and disbursed as hereinafter provided; or

2. A letter of credit (or letters of credit in amounts of $25,000 each) in the aggregate amount of the Cost, issued by a New York City commercial bank and in the form annexed hereto ("Letter of Credit"); or

3. A "Payment and Performance Bond" covering tenant's alteration is to be submitted to the Landlord from a New York State, licensed surety company acceptable to the Landlord.

If Tenant furnishes a Letter of Credit, Landlord shall only draw down the proceeds thereof (a) if a Mechanic's Lien is filed against the building in connection with the Work which is not discharged of record within ten days after Landlord notifies Tenant of the filing thereof,    (b) within thirty days prior to the expiration of the Letter of Credit, (c) if this lease is terminated, at any time thereafter, or (d) provided this Lease is then in full force and effect, ninety days after the date Landlord determines to be appropriate for the completion of the Work and Tenant has failed to complete the Work to Landlord's reasonable satisfaction and submit to Landlord:

(i)   written acknowledgement from all contractors, subcontractors, and material-men involved in the Work that all of their charges for the Work performed and materials furnished have been paid in full;

(ii)  all duplicate original final approvals from governmental bodies having jurisdiction, and

(iii) as built drawings and operating manuals for equipment installed.



If Landlord holds a deposit of monies, or if Landlord draws down such proceeds from the Letter of Credit, it shall hold and disburse such deposits or monies as follows:  Landlord may, at any time thereafter, discharge of record any then or subsequently arising outstanding Mechanic's Liens; and the remaining proceeds or monies shall be held until Tenant has completed the applicable Work to Landlord's satisfaction and has submitted to Landlord:

(i)     written acknowledgement from all contractors, sub-contractors and material-men involved in the Work that all of their charges for the Work performed and materials furnished have been paid in full;

(ii)    all duplicate original final approvals from governmental bodies having jurisdiction; and,

(iii)   as built drawings and operating manuals for equipment installed, whereupon any remaining proceeds or monies shall promptly be returned to Tenant.  However, if such Work has not been so completed and such acknowledgements have not been submitted to Landlord within thirty days after the date Landlord determines to be appropriate for the completion of such Work, Landlord may apply such proceeds or monies to the extent necessary to so complete such Work and obtain such acknowledgements, whereupon any remaining proceeds or monies shall be promptly returned to Tenant.

Notwithstanding the foregoing, in the event Landlord holds a deposit of monies or the Letter of Credit consists of more than one letter of credit, Landlord shall release such monies or each such letter of credit (in increments of no less than $20,000 each) as and when Tenant verifies completion of each portion of the Work to Landlord's satisfaction and submits to Landlord a written acknowledgment from the contractors, subcontractors or materialmen that he has paid for such Work in an amount not less than the amount of the requested monies or the letter of credit, provided, however, Landlord may at any time, use all or any portion of the monies or the Letter of Credit to discharge of record any then or subsequently arising mechanic's liens filed against the Building in connection with such Work which is not discharged of record within the time hereinbefore provided. In any event, Landlord shall not release the remaining $20,000 or last letter of credit in such amount until the entire Work has been completed and all approvals, proofs of full payment and "as built" drawings, as aforementioned, have been submitted to Landlord. In the event all Work has been completed and all proofs thereof, as aforesaid, submitted to Landlord, if any monies or letter(s) of credit are still held by Landlord, Landlord shall promptly remit same to Tenant.

**THE BANK OF NEW YORK**
INTERNATIONAL DIVISION.
P.O. BOX 11210, CHURCH St. STATION, NEW YORK, N.Y. 10249

D. 79285

, 1979

Irrevocable Letter of Credit

40 Central Park South, Inc.
40 Central Park South
New York, N. Y.   10019

Dear Sirs:

WE HEREBY AUTHORIZE YOU TO VALUE ON THE BANK OF NEW YORK, NEW YORK, NEW YORK

FOR ACCOUNT OF
UP TO THE AGGREGATE AMOUNT OF
($                    ) U.S. Currency            AND 00/100 dollars

AVAILABLE BY YOUR DRAFTS AT sight, accompanied by:

Your written statement that you are entitled to draw against the Letter of Credit in connection with work performed pursuant to a lease dated                        between (Landlord) and
(Tenant)

It is a condition of this Letter of Credit that it shall be extended for an additional period of one year from the present or future expiration date hereof unless thirty days prior to such date we shall notify you in writing that we elect not to renew this Letter of Credit for such additional period.  Upon receipt by you of such notice you may draw hereunder by means of your draft on us at sight accompanied by your written certification that you have not received an appropriate renewal of this Letter of Credit.

DRAFTS MUST BE DRAWN AND PRESENTED NOT LATER THAN

ALL DRAFTS DRAWN UNDER THIS CREDIT MUST BEAR ON THEIR FACE THE CLAUSE DRAWN UNDER THE BANK OF NEW YORK CREDIT NO. 79285"

EXCEPT SO FAR AS OTHERWISE EXPRESSLY STATED, THIS CREDIT IS SUBJECT O THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS 1974 REVISION) INTERNATIONAL CHAMBER OF COMMERCE, PUBLICATION NO. 290.

WE HEREBY AGREE WITH THE DRAWERS.  OF DRAFTS DRAWN IN COMPLIANCE WITH IE TERMS OF THIS CREDIT.  THAT THE SAME SHALL BE DULY HONORED ON RESENTATION TO THE DRAWEE.

YOURS VERY TRULY,

_____
AUTHORIZED SIGNATURE

EXHIBIT D

[NAME OF BANK]

No. _____          Irrevocable Letter of Credit

[Date]

[ADDRESS]

DEAR SIRS:

We hereby authorize you to value on (name of bank), NEW YORK, NEW YORK

FOR ACCOUNT OF

UP TO THE AGGREGATE OF
                    DOLLARS U.S. Currency.

AVAILABLE BY YOUR DRAFTS AT SIGHT, accompanied by:

Your written statement that you are entitled to draw against the Letter of Credit by reason of a default pursuant to a lease dated as of        , 1984 between            , Landlord, and Tenant.

It is a condition of this Letter of Credit that it shall be extended for an additional period of one year from the present or future expiration date hereof unless thirty days prior to such date we shall notify you in writing that we elect not to renew this Letter of Credit for such additional period. Upon receipt by you of such notice you may draw hereunder by means of your draft on us at sight accompanied by your written statement that you have not received an appropriate renewal of this Letter of Credit.

Drafts hereunder may be drawn not later than or any subsequent expiration date pursuant hereto.

All drafts drawn under this Credit must bear on their face the clause "DRAWN UNDER (name of bank) CREDIT NO.".

This Credit is transferrable in whole but not in part. However, no transfer shall be effective unless advice of such transfer is received by us in the form attached signed by you.

Except so far as otherwise expressly stated, this Credit is subject to the Uniform Customs and Practice for Documentary Credits (1983 Revision) International Chamber of Commerce, Publication No. 400.

We hereby agree with the Drawers of drafts drawn in compliance with the terms of this Credit, that the same shall be duly honored on presentation to the drawee.

Yours very truly,

_____
AUTHORIZED SIGNATURE
New York_____
        Date

RE:  Credit          Issued by

_____     _____

Gentlemen:

         For value received, the undersigned beneficiary
hereby irrevocably transfers to:

_____
                (Name of Second Beneficiary)


_____
                      (Address)

all rights of the undersigned beneficiary to draw under the
above Letter of Credit in its entirety.

         By this transfer, all rights of the undersigned
beneficiary in such Letter of Credit are transferred to the
second beneficiary and the second beneficiary shall have the
sole rights as beneficiary thereof, including sole rights
relating to any amendments whether increases or extensions
or other amendments and whether now existing or hereafter
made.  All amendments are to be advised direct to the second
beneficiary without necessity of any consent of or notice of
the undersigned beneficiary.

         The advice of such Letter of Credit is returned
herewith, and we ask you to endorse the assignment on the
reverse thereof and forward it direct to the second bene-
ficiary with your customary notice of transfer.

         Enclosed is remittance of $100.00 in payment of
your transfer commission and in addition thereto we agree to
pay you on demand any expenses which may be incurred by you
in connection with this transfer.

                          Yours very truly,

SIGNATURE AUTHENTICATED

         (Bank)              Signature of Beneficiary

(Authorized Signature)

B Form 4 (Rev. 8/82)

# THE CITY OF NEW YORK

# DEPARTMENT OF BUILDINGS

## AMENDED CERTIFICATE OF OCCUPANCY

BOROUGH  MANHATTAN          DATE:              NO. 85739

Amends

This certificate supersedes C.O. No. 80808    MAY 25 1984   ZONING DISTRICT C 5-3

THIS CERTIFIES that the new–altered–existing–building–premises located at

40 Central Park South                              Block 1274    Lot 6

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN

### PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS PER SQ FT. | MAXIMUM NO OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| Cellar | 0.8. | – | – | – | 2,6 | – | Boiler room, storage, tenant laundry, valet, help locker print shop, carpenter shop, kitchen and utilities |
| 1st | 100 | 210 | 2 | – | 6,2 | F4 | Eating & Drinking Place, U. 6, kitchen, doctors offices two (2) apartments, six (6) servant rooms |
| 2nd-3rd | – | – | 9 ea | 2 ea. | – | J2 | Apartments |
| 4th | – | – | 10 | 2 | – | J2 | Apartments |
| 5th | – | – | 9 | 2 | – | J2 | Apartments |
| 6th | – | – | 8 | 2 | – | J2 | Apartments |
| 7th-10th | – | – | 9 ea | 2 ea. | – | J2 | Apartments each floor |
| 11th | – | – | 7 & ½ | 2 | – | J2 | Apartments |
| 12th | – | – | 8 & ½ | 2 | – | J2 | Apartments |
| 13th | 40 | – | 8 | 2 | – | J2 | Apartments |
| 14th | 40 | – | 7 | 2 | – | J2 | Apartments |
| 15th | 40 | – | 7 | 2 | – | J2 | Apartments |
| 16th | 40 | – | 7 | 2 | – | J2 | Apartments |
| 17th | 40 | – | 4 | 2 | – | J2 | Apartments |
| 18th | 40 | – | 5 | 2 | – | J2 | Apartments |
| 19th | 40 | – | 1 | 2 | – | J2 | Apartment |
| Penthouse | 40 | – | 3 | 2 | – | J2 | Apartments |

(CONTINUED)

RECEIVE

MAY 3

A.I.C.O

OPEN SPACE USES _____   –

(SPECIFY—PARKING SPACE, OTHER USES, NONE)

THIS CERTIFICATE ... MUST BE POSTED WITHIN THE BU... ... WITH THE RULES ... MARCH 31ST, 1967.

NO CHANGES OF USE OR OCCUPANCY SHALL BE MADE UNLESS A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED

THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND SPECIFICATIONS NOTED ON THE REVERSE SIDE.

_____          _____
BOROUGH SUPERINTENDENT                      COMMISSIONER

☒ ORIGINAL    ☐ OFFICE COPY–DEPARTMENT OF BUILDINGS    ☐ COPY

EXHIBIT F

Form 54 (Back) (Rev. 8/82)

THAT THE ZONING LOT ON WHICH THE PREMISES IS LOCATED IS BOUNDED AS FOLLOWS:

BEGINNING at a point on the  North                    side of West 58th Street
distant  120' East                    feet from the corner formed by the intersection of
West 58th Street and Sixth Avenue

running thence ....east 127'-0" ........................... feet; thence .....north 100'-5"........................... feet;

thence ...............west 5'-0" ........................... feet; thence .....north 100'-5"........................... feet;

thence ...............west 125'-0" ........................... feet; thence .....south 200'-10"........................... feet;

thence ........................................................ feet; thence ........................................................ feet;
to the point or place of beginning.

NEW ALT. No. 1276/82 DATE OF COMPLETION 5/18/84   CONSTRUCTION CLASSIFICATION Class 1-Fireproof
BUILDING OCCUPANCY GROUP CLASSIFICATION          HEIGHT  21   STORIES, 220'  FEET
Eating and Drinking and Class "A"
Apartments

THE FOLLOWING FIRE DETECTION AND EXTINGUISHING SYSTEMS ARE REQUIRED AND WERE INSTALLED IN COMPLIANCE WITH
APPLICABLE LAWS.

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| STANDPIPE SYSTEM | | | AUTOMATIC SPRINKLER SYSTEM | | |
| YARD HYDRANT SYSTEM | | | | | |
| STANDPIPE FIRE TELEPHONE AND SIGNALLING SYSTEM | | | | | |
| SMOKE DETECTOR | | | | | |
| FIRE ALARM AND SIGNAL SYSTEM | | | | | |

STORM DRAINAGE DISCHARGES INTO:
A) STORM SEWER  ☐    B) COMBINED SEWER ☐    C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

SANITARY DRAINAGE DISCHARGES INTO:
A) SANITARY SEWER ☐    B) COMBINED SEWER ☐    C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

LIMITATIONS OR RESTRICTIONS:
BOARD OF STANDARDS AND APPEALS CAL. NO. _____
CITY PLANNING COMMISSION CAL. NO. _____
OTHERS:

THE CITY OF NEW YORK

# DEPARTMENT OF BUILDINGS

## AMENDED CERTIFICATE OF OCCUPANCY

BOROUGH MANHATTAN          DATE:               NO. 85789

This certificate supersedes C.O. No. 80808     Amends          ZONING DISTRICT C 5-3

THIS CERTIFIES that the new—altered—existing—building—premises located at
40 Central Park South                                  Block 1274    Lot 6
CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE
LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN

### PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS PER SQ. FT. | MAXIMUM NO. OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| Penthouse 1 | 40 | – | 1/2 | 2 | – | J2 | Apartment |
| Penthouse 2 | 40 | – | 1/2 | 2 | – | J2 | Apartment |
| | | Eating and Drinking Place and Class "A" Apartments | | | | | |
| | | This is an Amended Certificate of Occupancy. | | | | | |

OPEN SPACE USES _____
(SPECIFY—PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

NO CHANGES OF USE OR OCCUPANCY SHALL BE MADE UNLESS
A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED
THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND
SPECIFICATIONS NOTED ON THE REVERSE SIDE.

BOROUGH SUPERINTENDENT                    COMMISSIONER

☒ ORIGINAL   ☐ OFFICE COPY—DEPARTMENT OF BUILDINGS   ☐ COPY

9 Form. 54 (Back) (Rev. 8/82)

THAT THE ZONING LOT ON WHICH THE PREMISES IS LOCATED IS BOUNDED AS FOLLOWS:

BEGINNING at a point on the .............................................. side of
distant .............................................. feet from the corner formed by the intersection of
.............................................. and

running thence .............................................................................. feet; thence ............................................................ feet;

thence ............................................................................................ feet; thence ............................................................ feet;

thence ............................................................................................ feet; thence ............................................................ feet;

thence ...............................................................................
to the point or place of beginning.

N.B. or ALT. No.          DATE OF COMPLETION
BUILDING OCCUPANCY GROUP CLASSIFICATION

CONSTRUCTION CLASSIFICATION
HEIGHT          STORIES,          FEET

THE FOLLOWING FIRE DETECTION AND EXTINGUISHING SYSTEMS ARE REQUIRED AND WERE INSTALLED IN COMPLIANCE WITH APPLICABLE LAWS.

|  | YES | NO |  | YES | NO |
|---|---|---|---|---|---|
| AUTOMATIC SPRINKLER SYSTEM |  |  |  |  |  |
| STANDPIPE SYSTEM |  |  |  |  |  |
| YARD HYDRANT SYSTEM |  |  |  |  |  |
| STANDPIPE FIRE TELEPHONE AND SIGNALLING SYSTEM |  |  |  |  |  |
| SMOKE DETECTOR |  |  |  |  |  |
| FIRE ALARM AND SIGNAL SYSTEM |  |  |  |  |  |

STORM DRAINAGE DISCHARGES INTO:
A) STORM SEWER ☐     B) COMBINED SEWER ☐     C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

SANITARY DRAINAGE DISCHARGES INTO:
A) SANITARY SEWER ☐     B) COMBINED SEWER ☐     C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

LIMITATIONS OR RESTRICTIONS:
BOARD OF STANDARDS AND APPEALS CAL. NO. _____
CITY PLANNING COMMISSION CAL. NO. _____
OTHERS:



MICKEY'S

FIXTURE/FURNISHING PLAN

■ HIRSCH/BEDNER AND ASSOCIATES ■ DESIGN CONSULTANTS ■ 3216 NEBRASKA AVENUE ■ SANTA MONICA, CALIFORNIA 90404 ■ 213/829-9087 ■ TELEX 910-343-6251 ■

FF-1.1

All T.V. locations
are approximate
estimations of
actual locations.

Sidewalk cafe
Subject to Article 57B

EXHIBIT E

# ACKNOWLEDGMENTS

**Corporate Owner**
State of New York, } ss.:
County of

On this          day of           , 19    , before me

personally came
to be known, who being by me duly sworn, did depose and say that
he resides in

that he is the           of

the corporation described in and which executed the foregoing
instrument, as OWNER; that he knows the seal of said corporation;
that the seal affixed to said instrument is such corporate seal; that it
was so affixed by order of the Board of Directors of said
corporation, and that he signed his name thereto by like order.

**Individual Owner**
State of New York, } ss.:
County of

On this          day           , 19    , before me

personally came
to me known and known to me to be the individual described in
and who, as OWNER, executed the foregoing instrument and
acknowledged to me that    he    executed the same.

**Corporate Tenant**
State of New York, } ss.:
County of

On this          day of           , 19    , before me

personally came
to me known, who being by me duly sworn, did depose and say that
he resides in

that he is the           of

the corporation described in and which executed the foregoing in-
strument, as TENANT; that he knows the seal of said corporation;
that the seal affixed to said instrument is such corporate seal; that it
was so affixed by order of the Board of Directors of said
corporation, and that he signed his name thereto by like order.

**Individual Tenant**
State of New York, } ss.:
County of

On this          day of           , 19    , before me

personally came
to me known and known to me to be the individual    described in
and who, as TENANT, executed the foregoing instrument and
acknowledged to me that    he    executed the same.

## RULES AND REGULATIONS ATTACHED TO AND
## MADE A PART OF THIS LEASE
## IN ACCORDANCE WITH ARTICLE 35.

1. The sidewalks, entrances, driveways, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or encumbered by any Tenant or used for any purpose other than for ingress to and egress from the demised premises and for delivery of merchandise and equipment in a prompt and efficient manner using elevators and passageways designated for such delivery by Owner. There shall not be used in any space, or in the public hall of the building, either by any tenant or by jobbers, or others in the delivery or receipt of merchandise, any hand trucks except those equipped by rubber tires and safeguards.

2. If the premises are situated on the ground floor of the building Tenant thereof shall further, at Tenant's expense, keep the sidewalks and curb in front of said premises clean and free from ice, snow, etc.

3. The water and wash closets and plumbing fixtures shall not be used for any purposes other than those for which they were designed or constructed.

4. Tenant shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the demised premises, or permit or suffer the demised premises to be occupied or used in a manner offensive or objectionable to Owner or other occupants of the building by reason of noise, odors and/or vibrations or interfere in any way with other Tenants or those having business therein.

5. No sign, advertisement, notice or other letting shall be exhibited, inscribed, painted or affixed by any Tenant on any part of the outside of the demised premises or the building or on the inside of the demised premises if the same is visible from the outside of the premises without the prior written consent of Owner, except that the name of Tenant may appear on the entrance door of the premises. In the event of the violation of the foregoing by any Tenant, Owner may remove same without any liability, and may charge the expense incurred by such removal to Tenant or Tenants violating this rule. Signs on interior doors and directory tablet shall be inscribed, painted or affixed for each Tenant by Owner at the expense of such Tenant and shall be of a size, color and style acceptable to Owner.

6. No Tenant shall mark, paint, drill into, or in any way deface any part of the demised premises or the building of which they form a part. No boring,

cutting or stringing of wires shall be permitted, except with the prior written consent of Owner, and as Owner may direct. No Tenant shall lay linoleum, or other similar floor covering, so that the same shall come in direct contact with the floor of the demised premises, and, if linoleum or other similar floor covering is desired to be used an interlining of builder's deadening felt shall be first affixed to the floor, by a paste or other material, soluble in water, the use of cement or other similar adhesive material being expressly prohibited.

7. Freight, furniture, business equipment, merchandise and bulky matter of any description shall be delivered to and removed from the premises only on the freight elevators and through the service entrances and corridors, and only during hours and in a manner approved by Owner. Owner reserves the right to inspect all freight to be brought into the building and to exclude from the building all freight which violates any of these Rules and Regulations or the lease of which these Rules and Regulations are a part.

8. Owner reserves the right to exclude from the building between the hours of 6 P.M. and 8 A.M. and at all hours on Sundays, and holidays all persons who do not present a pass to the building signed by Owner. Owner will furnish passes to persons for whom any Tenant requests same in writing Each Tenant shall be responsible for all persons for whom he requests such pass and shall be liable to Owner for all acts of such person.

9. Owner shall have the right to prohibit any advertising by any Tenant which, in Owner's opinion, tends to impair the reputation of Owner or its desirability as a building for stores or offices, and upon written notice from Owner, Tenant shall refrain from or discontinue such advertising.

10. Tenant shall not bring or permit to be brought or kept in or on the demised premises, any inflammable, combustible or explosive fluid, material, chemical or substance, or cause or permit any odors of cooking or other processes, or any unusual or other objectionable odors to permeate in or eminate from the demised premises.

11. Tenant shall not place a load on any floor of the demised premises exceeding the floor load per square foot area which it was designed to carry and which is allowed by law. Owner reserves the right to prescribe the weight and position of all safes, business machines and mechanical equipment. Such installations shall be placed and maintained by Tenant at Tenant's expense in setting sufficient in Owner's judgement to absorb and prevent vibration, noise and annoyance.

## GUARANTY

The undersigned Guarantor guarantees to Owner, Owner's successors and assigns, the full performance and observance of all the agreements to be performed and observed by Tenant in the attached Lease, including the "Rules and Regulations" as therein provided, without requiring any notice to Guarantor of nonpayment or, nonperformance, or proof, or notice of demand, to hold the undersigned responsible under this guaranty, all of which the undersigned hereby expressly waives and expressly agrees that the legality of this agreement and the agreements of the Guarantor under this agreement shall not be ended, or changed by reason of the claims to Owner against Tenant of any of the rights or remedies given to Owner as agreed in

the attached Lease. The Guarantor further agrees that this guaranty shall remain and continue in full force and effect as to any renewal, change or extension of the Lease. As a further inducement to Owner to make the Lease Owner and Guarantor agree that in any action or proceeding brought by either Owner or the Guarantor against the other on any matters concerning the Lease or of this guaranty Owner and the undersigned shall and do waive trial by jury.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Guarantor

STANDARD FORM OF

**Store Lease**

The Real Estate Board of New York, Inc.
© Copyright 1979, All Rights Reserved.
Reproduction in whole or in part prohibited.

TO

Address

Premises

19

Dated

Rent per Year

Rent per Month

Term
From
To

Drawn by.............. Checked by............

Entered by............ Approved by............

## SECOND LEASE MODIFICATION AGREEMENT

SECOND LEASE MODIFICATION AGREEMENT made this 23 day of December, 2009 between 40 CPS ASSOCIATES, LLC, having an office at c/o Atco Properties & Management, Inc., 555 Fifth Avenue, New York, New York 10017 ("Landlord") and MAJESTIC SPORTS LTD. D/B/A MICKEY MANTLES RESTAURANT, having an office at 40 Central Park South, New York, New York 10019 ("Tenant").

## W I T N E S S E T H

WHEREAS:

(A)    Pursuant to the Lease (as defined on Exhibit A annexed hereto), Landlord has leased to Tenant a portion of the ground floor and cellar (collectively, "Demised Premises") of Landlord's buildings at 40 Central Park South and 41 West 58th Street, New York, New York (collectively, "Building").

(B)    Landlord and Tenant desire to modify the Lease so as to, among other things, extend the term thereof to July 31, 2020, all as hereinafter more particularly set forth.

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the parties hereto hereby covenant and agree as follows:

1.    Unless otherwise defined in this Agreement, the capitalized terms contained herein shall have the respective meanings ascribed to them in the Agreement of Lease (as defined on Exhibit A annexed hereto).

2.    (a) The term of the Lease is hereby extended to July 31, 2020 upon all the terms, covenants and conditions as are contained in the Lease, except as otherwise hereinafter provided.

(b) All references in the Lease to the "Expiration Date" shall be deemed to refer to July 31, 2020.

(c) All references in the Lease and herein to the "Term" shall be deemed to refer to the period ending on July 31, 2020.

3.    Effective as of August 1, 2010:

(a) The Fixed Rent shall be $845,000.00 per annum;

(b) "Base Year Taxes" shall mean the Real Estate Taxes as finally determined for the tax fiscal year July 1, 2010-June 30, 2011 (which shall thereupon become the "Base Year");

(c) Article 42 of the Agreement of Lease shall be deleted in its entirety;

(d) Article 44(B) of the Agreement of Lease shall be deleted in its entirety;

(e) Article 47(C) (2) – (6) of the Agreement of Lease shall be deleted in its entirety;

(f) Article 47(E) of the Agreement of Lease shall be deleted in its entirety;

(g) The portion of Article 47 (1) of the Agreement of Lease beginning with "Any such french restaurant" through the end of the such Article shall be deleted in its entirety;

(h) Article 47 (J) of the Agreement of Lease shall be amended as follows:

Tenant may sell proprietary food products and such sports memorabilia, including without limitation books, shirts, caps, jackets and autographed pictures of athletes in the demised premises, provided that, except as set forth in Article 49 (E) hereof, there shall be no advertising or other promotion whatsoever of such sales in any media, including, without limitation, any signs in the windows of the demised premises, Tenant may, however, advertise the appearance of sports personalities in the demised premises.

(i) Article 48 (C) of the Agreement of Lease shall be deleted in its entirety;

(j) Article 72 of the Agreement of Lease shall be deleted in its entirety.

4. (a) Effective as of August 1, 2013, the Fixed Rent shall be further increased by $50,000.00 per annum for the balance of the term;

(b) Effective as of August 1, 2016, the Fixed Rent shall be further increased by $50,000.00 per annum for the balance of the term; and

(c) Effective as of August 1, 2018, the Fixed Rent shall be further increased by $50,000.00 per annum for the balance of the term.

5.      Commencing on August 1, 2012, August 1, 2014, August 1, 2016 and August 1, 2018, the parties further agree that the Fixed Rent shall be further compounded by 6 % Fixed Percentage Escalation increases. These increases shall be in addition to those provided for in Article 4 herein.

6.      The Landlord shall not be required to perform any work to prepare the demised premises for Tenant's continued occupancy.

7.      Tenant has agreed to perform $600,000.00 in improvements within the Demised Premises which are of at least Building Standard quantity and quality, as outlined in Building Standard Installations (a copy of which are annexed hereto as Exhibit B) and which have no adverse effect on the Building's operating systems or facilities ("Tenant's Work"). Tenant's Work shall also be subject to compliance with all applicable provisions of this lease and the Building's Rules and Regulations Governing Tenant Alterations. Tenant will provide a renovation plan that includes the renovation of the exterior façade, bathrooms, kitchen, air conditioning exhaust systems interior lighting, the delivery area, walk-in refrigerators and other cosmetic upgrades all by the conclusion of the second quarter of 2011.

8.      Notwithstanding the foregoing, the Fixed Rent shall abate for four (4) months once Tenant shall provide Landlord with signed and sealed affidavit from a licensed architect in CSI format detailing that Tenant has expended not less than $600,000.00 in the performance of Tenant's Work to renovate the Demised Premises. Said expenditure shall not include the cost of Tenant's furniture, fixtures, equipment and other personal property.

9.      (a)     Supplementing Article 56 of the Lease and subject to Article 56 (B), the parties agree that there shall be no sale or assignment of lease without Landlord's absolute approval. If Tenant's Notice (as defined in Article 56 ) indicates that Tenant desires to sublease or license the Demised Premises, Landlord may, within sixty (60) days after its receipt of Tenant's Notice, by notice to Tenant ( "Landlord's Notice"), terminate this Lease as of the proposed commencement date for such sublease or license. All notices hereunder shall be made in writing, signed by the party giving notice, and shall be deemed effective upon personal delivery or upon the fourth business day following deposit with the United States Postal Service, by registered or certified mail, with postage and fees prepaid. Notices shall be addressed to either party hereto at its address as shown or at such other address as such party may designate by 10 days' advance written notice to the other party hereto, and in the case of Tenant, with a copy to Fridman Law Group, PLCC, 287 Spring Street, New York, New York 10013 Attention: Jerald M. Tenenbaum, Esq.

(b)     If Landlord consents to a proposed assignment or sublease and Tenant thereafter assigns this lease or subleases all or any part of the demised premises (collectively, "Tenant's Disposition"), Tenant shall pay Landlord, on the first day of each month during the term of the Tenant's Disposition, 50% of the amount by which (1) the

fixed rent and tax and fixed percentage escalation payments, and any other amounts, due under such Tenant's Disposition which are received by Tenant during the preceding month, exceeds (2) the portion of the Fixed Rent and amounts due pursuant to Article 41 of the Lease which is attributable, on a pro rata basis, to the portion of the demised premises covered by Tenant's Disposition, for such preceding month.  In addition, if Tenant receives any other consideration for such Tenant Disposition, Tenant shall pay Landlord 50% of such consideration within ten (10) days after Tenant's receipt thereof.

10.    Upon execution of this Agreement by Tenant, Tenant shall deliver to Landlord the sum of $146,250.00 to increase the Security Deposit held by Landlord to $211,250.00, which increase may be in the form of a Letter of Credit, in Tenant's sole discretion. If Tenant assigns this lease or sublets all or any part of the demised premises, the security deposit shall further increase by an additional $211,250.00.

11.    All references to Willaim Liederman of the Agreement of Lease shall be replaced with "Christopher Villano".

12.    Landlord shall use best efforts to provide the Tenant with a usual and customary Subordination, Non Disturbance Agreement ("SNDA") prepared by Landlord's current lender or any subsequent lender.  Tenant shall be responsible to reimburse Landlord for any lender costs associated with obtaining the SNDA.

13.    If Landlord is required to erect scaffolding along the demised premises, Tenant may place sign on scaffolding advertising its name. Said sign must be pre approved by Landlord whose approval will not be unreasonably withheld.

14.    Landlord and Tenant each represent and warrant to each other that they dealt solely with Atco Property Services Corporation and Dakota Realty Group LLC ("Brokers") as brokers in connection with this Agreement. Landlord shall pay the broker's commission pursuant to a separate agreement. Landlord and Tenant each agree to indemnify and save the other party hereto harmless from any claim of any other brokers, firms or entities with whom the indemnifying party has dealt.

15.    Except as expressly modified hereby, the Lease is unmodified hereby, the Lease is unmodified and in full force and effect in accordance with its terms and, as so modified hereby, the Lease is hereby ratified and confirmed.

16.    This Agreement may not be changed or terminated orally and shall be binding upon and inure to the benefit of the successors and, except as otherwise provided in the Lease, the assigns of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

40 CPS ASSOCIATES, LLC
By: Atco Properties & Management, Inc.,
    Agent

By: _____
    Name:    Peter C. Di Capua
    Title:     C. O. O.


MAJESTIC    SPORTS    LTD.    D/B/A
MICKEY MANTLES RESTAURANT

By: _____
Name:    CHRISTOPHER G. VILLANO
Title:     President

## EXHIBIT A

As used in the Lease Modification Agreement to which this Exhibit A is annexed, the term "Lease" or **"Agreement of Lease"** shall mean, collectively, the following:

Agreement of Lease, dated as of August 1, 1987 between 40 Central Park South, Incorporated and Liedermen/Lowy Ventures, Inc. ("Agreement of Lease") as (a) assigned by Liedermen/Lowy Ventures, Inc. to Majestic Sports Ltd. by Assignment and Assumption of Lease dated as of January 31, 1988, (b) modified by letter agreement, dated February 28, 1996, between 40 Central Park South, Incorporated and Majestic Sports Ltd. d/b/a Mickey Mantle Restaurant ("Letter Agreement") modified by Commencement Date Agreement for Additional Space, dated April 17, 1996, between 40 Central Park South, Incorporated and Majestic Sports Ltd. d/b/a Mickey Mantles Restaurant (c) further modified by Lease Modification Agreement dated March 23, 2000.

## LEASE MODIFICATION AGREEMENT

AGREEMENT made this 23 day of March, 2000 between 40 CENTRAL PARK SOUTH, INCORPORATED, a New York corporation, having an office c/o Atco Properties & Management, Inc., 555 Fifth Avenue, New York, New York 10017 ("Landlord") and MAJESTIC SPORTS LTD. D/B/A MICKEY MANTLE RESTAURANT, a New York limited partnership, having an office at 42 Central Park South, New York, New York 10019 ("Tenant").

### W I T N E S S E T H

WHEREAS:

(A)  Pursuant to the Lease (as defined on Exhibit A annexed hereto), Landlord has leased to Tenant a portion of the ground floor and cellar (collectively, "Demised Premises") of Landlord's buildings at 40 Central Park South and 41 West 58th Street, New York, New York (collectively, "Building").

(B)  Landlord and Tenant desire to modify the Lease so as to, among other things, extend the term thereof to July 31, 2010, all as hereinafter more particularly set forth.

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the parties hereto hereby covenant and agree as follows:

1.  Unless otherwise defined in this Agreement, the capitalized terms contained herein shall have the

respective meanings ascribed to them in the Agreement of Lease (as defined on Exhibit A annexed hereto).

2.    (a)    The term of the Lease is hereby extended to July 31, 2010 upon all the terms, covenants and conditions as are contained in the Lease, except as otherwise hereinafter provided.

(b)    All references in the Lease to the "Expiration Date" shall be deemed to refer to July 31, 2010.

(c)    All references in the Lease and herein to the "Term" shall be deemed to refer to the period ending on July 31, 2010.

3.    Effective as of August 1, 2000:

(a) the Fixed Rent shall be increased to $579,000.00 per annum;

(b)    "Base Year Taxes" shall mean the Real Estate Taxes as finally determined for the tax fiscal year July 1, 2000-June 30, 2001 (which shall thereupon become the "Base Year");

(c) Article 42(B) of the Agreement Of lease shall be amended to read as follows:

> "(B) For the purposes hereof, "Index" shall mean the "All Items" Consumer Price Index for all Urban Consumers in the New York-Northern New Jersey-Long Island, NY-NJ-CT-PA area, determined by the Bureau of Labor Statistics of the United States Department of Labor (1982-1984=100), or, if such index is discontinued, the most comparable index (reflecting changes in costs of housing, energy and services) published by any other federal, New York State or New York City governmental authority."; and

(d) Article 7 of the Letter Agreement (as defined on Exhibit A annexed here) shall be deemed deleted.

4.    (a)    Effective as of August 1, 2002, the Fixed Rent shall be further increased by $26,000.00 per annum for the balance of the Term;

(b)    Effective as of August 1, 2005, the Fixed Rent) shall be further increased by $27,250.00 per annum for the balance of the Term; and

(c) Effective as of August 1, 2008 the Fixed Rent shall be further increased by an additional $27,250.00 per annum for the balance of the Term.

(d) The increases in the Fixed Rent provided for in this Article 4 shall be in addition to those provided for in Article 42 of the Agreement of Lease.

5.    On or before July 31, 2000, Tenant shall perform the following work in accordance with all the applicable provisions of the Lease (including, without limitation, Article 3 and 48 of the Agreement of Lease):

(a)    <u>Work to the Exterior of the Demised Premises</u>

(i)    Clean and paint the street level facade.

(ii) Replace the white fabric on the underside of the entrance canopy to the Demised Premises.

(iii) Repair the mechanism in the retractable horizontal canopy of the Demised Premises so that it remains square, even and level in all positions (_i.e._ - in the extended, partially retracted or fully retracted positions).

(iv) Professionally refinish the terrazzo on both the steps of the facade and the entrance into the Demised Premises to eliminate existing cracks and leave a clean, continuous, uniform and polished finish.

(v) Repaint the entire ceiling in the revolving door area of the Demised Premises a light color to make the entrance brighter and cleaner.

(b) <u>Work to the Interior of the Demised Premises</u>

(i) Recess all the exposed wires into existing walls and ceilings and patch as necessary.

(ii) After concealing the exposed wires, paint the entire Demised Premises.

        (iii)   Replace or paint all tracks for
the lighting and clean and
reinstall all light heads.

        (iv) Sand and rehabilitate the base
boards throughout the Demised
Premises.  If, in Landlord's
opinion, such base boards do not
look first class after such
rehabilitation, Tenant shall
promptly replace the same.

6.   Or before July 31, 2000, Landlord shall
perform the following work:

        (a)   Paint the internal hallway between the
lobby of 40 Central Park South and the
Demised Premises.

        (b)   Paint the planter in the courtyard
behind the Demised Premises.

7.   Whenever Landlord's cleaning contractor
cleans the granite Central Park South facade of the
Building, it will do so up to the facade of the Demised
Premises.

8.   Tenant acknowledges that, pursuant to
Article 47(D) of the Agreement of Lease, it is required to
maintain and operate pollution control equipment in the
Demised Premises in a first class manner so as to prevent
any smoke, fumes, odors or other annoying substances from

emanating from the Demised Premises to the annoyance of any other occupants of the Building.

9. . Throughout the Term, Tenant shall maintain and keep in effect a maintenance agreement for its fire prevention equipment which, at the minimum, will provide for the performance of all the bi-monthly procedures set forth in paragraph 2 of the letter dated November 24, 1999 by Scientific Fire Prevention Company attached hereto as Exhibit A.  Tenant shall provide Landlord with a copy of such maintenance agreement and of all renewals thereof.

10. Article 47(G) of the Agreement of Lease is hereby amended in its entirety to read as follows:

> "(G) (1)  Tenant shall not create or permit any nuisance in the demised premises and shall not make or permit any noise or vibrations that is reasonably objectionable to other occupants of the Building, adjoining premises or to the public.  Tenant shall keep the front windows and entrance door to the demised premises closed (but not locked) after 10:30 P.M. in order to minimize the noise emanating from the demised premises.  Nothing in the foregoing shall, however, be deemed to diminish Tenant's obligations under the following subdivision (2) of this Article 47(G).
>
> (2)  Tenant shall not at any time permit any live or recorded music in the demised premises which can be heard outside of the demised premises or in any other portion of the Building."

11. The following hereof is added after Article 47(K) of the Agreement of Lease:

> "(L) Tenant may participate in a so-called "dining to go" program from the demised

premises subject to its strict compliance
with all the applicable provisions of this
lease and the following terms and
conditions:

(1) all such "dining to go" orders must
be placed with a third party entity
which is not located at the demised
premises (the "Booking Agent");

(2)  in no event shall the party which
placed the "dining to go" order pick up
the same at the demised premises (i.e.
- such order shall be picked up by the
Booking Agent and delivered by the
Booking Agent to such ordering party);

(3)  all "dining to go" orders shall be
picked up by the Booking Agent after
twelve noon and before that day's close
of business;

(4)  the menu of such "dining to go"
service shall be substantially similar
to the menu offered by Tenant in the
restaurant business conducted by it at
the demised premises;

(5) all deliveries with respect to such
"dining to go" service shall be through
the entrance to the demised premises on
58th Street and shall be made either by
motorized van or by foot but, in no
event whatsoever, shall bicycles be
used to make deliveries for such
"dining to go" service; and

(6)  the personnel of such "dining to
go" service (including, without
limitation, the delivery personnel)
shall not loiter on the street adjacent
to the demised premises."

12.  The references to "John C. Lowy" or "John R.
Lowy" in Articles 47(E) and 56(J) of the Agreement of Lease
are hereby deleted.

13.    Landlord and Tenant each represent to each other that they have not dealt with any broker in connection with this Agreement.   Landlord and Tenant, as the case may be, shall indemnify the other against any liability and expense (including reasonable attorneys' fees) for any brokerage commission or finder's fee related to this Agreement based on the acts of the indemnifying party or its agents and representatives.   Any liability hereunder shall survive the expiration or termination of the Lease, as modified hereby.

14.    Except as expressly modified hereby, the Lease is unmodified and in full force and effect in accordance with its terms and, as so modified hereby, the Lease is hereby ratified  and confirmed.

15.    This Agreement may not be changed or terminated orally and shall be binding upon and inure to the benefit of the successors and, except as otherwise provided in the Lease, the assigns of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

40 CENTRAL PARK SOUTH, INCORPORATED

By: _____

    Name:

    Title:


MAJESTIC SPORTS LTD D/B/A MICKEY MANTLE RESTAURANT

By: _____

    Name:

    Title:

Assignee agrees to save, indemnify, defend and hold Assignor harmless from and on account of any claims, demands, actions, losses, expenses and liabilities (including attorneys' fees) of Assignor under the Lease on account of or arising out of the obligations and liabilities so assumed.

4. CONTINGENCIES.

Notwithstanding anything to the contrary herein, this Assignment shall be contingent upon the following occurring on the Effective Date:

a.  Payment of all arrears by Assignor to Landlord. Landlord represents that December's Rent was paid and agrees to accept January's Rent upon execution of this agreement;

b.  Landlord will return to Assignor the letter of credit in the amount of $146,250.00 and Assignor's cash security of $65,000.00 after appropriate deductions covering the remaining arrears;

c.  Assignee will post security in the amount of $211,250.00 either in the form of cash security and/or Letter of Credit;

d.  Receipt of financials by Assignee confirming financial stability;

e.  Execution of a Lease amendment which provides:

(1) Assignee will not be required to remove improvements as set forth in Article 3 of the Lease upon its surrender of the Premises;

(2) Article 54 of the Lease is deleted in its entirety and Assignee will be permitted to make deliveries outside the Buildings;

(3) Landlord will grant Assignee two (2) five (5) year options to renew at fair market value to be exercised if Assignee is not in default. Assignee must give Landlord notice of its intent to renew one year prior to lease expiration;

(4) The amendment shall include a schedule setting forth the rental payments due under the Lease as amended; and

(5) The four (4) months of free rent set forth in the Lease to be allocated upon receipt of a signed and sealed affidavit from a licensed architect detailing that Assignor has expended not less than $600,000.00 in work for the demised premises will be accelerated for the benefit of the Assignee to commence upon the Effective Date hereof;

## EXHIBIT A

As used in the Lease Modification Agreement to which this Exhibit A is annexed, the term "Lease" shall mean, collectively, the following:

Agreement of Lease, dated as of August 1, 1987 between 40 Central Park South, Incorporated and Liedermen/Lowy Ventures, Inc. ("Agreement of Lease") as (a) assigned by Liederman/Lowy Ventures Inc. to Majestic Sports Ltd. by Assignment and Assumption of Lease dated as of January 31, 1988, (b) modified by letter agreement, dated February 28, 1996, between 40 Central Park South, Incorporated and Majestic Sports Ltd. d/b/a Mickey Mantle Restaurant ("Letter Agreement"), and (c) further modified by Commencement Date Agreement for Additional Space, dated April 17, 1996, between 40 Central Park South, Incorporated and Majestic Sports Ltd. d/b/a Mickey Mantle Restaurant.

June 30, 1988

Re: Lease, dated August 1, 1987, between 40
Central Park South, Incorporated and
Liederman/Lowy Ventures Inc. (the "Lease")

40 Central Park South, Incorporated
c/o Joseph Hilton & Associates
444 Madison Avenue
New York, New York 10022
  Attention: Nicki Heryet

Dear Nicki:

Pursuant to paragraph 56(J) of the Lease (as previously extended), Liederman/Lowy Ventures Inc. has assigned its interest in the Lease to Majestic Sports, Ltd., a New York limited partnership. A duplicate original of the instrument of assignment is enclosed. A copy of the Certificate of Limited Partnership of Majestic Sports, Ltd. is also enclosed.

Liederman/Lowy Ventures Inc. is the sole general partner of Majestic Sports, Ltd. As required by paragraph 56(J) of the Lease, William Liederman and John Lowy own in the aggregate in excess of 30% of the interests of Majestic Sports, Ltd. as limited partners and will remain active in the day to day conduct of the business conducted at the premises.

Notices to Majestic Sports, Ltd. should be addressed c/o Liederman/Lowy Ventures Inc., 42 Central Park South, New York, New York.

Please contact the undersigned if you require additional information concerning the assignment.

Very truly yours,

Liederman/Lowy Ventures Inc.

By: _____
    John Lowy
    President

Enclosure
By Hand

With Copy by
Certified Mail

ASSIGNMENT AND ASSUMPTION
OF LEASE

ASSIGNMENT AND ASSUMPTION, made as of this 31st day
of January, 1988, by and between LIEDERMAN/LOWY VENTURES
INC., a New York corporation having an office at 42 Central
Park South, New York, New York ("Assignor"), and MAJESTIC
SPORTS, LTD., a New York limited partnership having an
office at 42 Central Park South, New York, New York
("Assignee").

W I T N E S S E T H :

WHEREAS, Assignor is the lessee of space in a
building located at 42 Central Park South, New York, New
York pursuant to a lease dated August 1, 1987 between 40
Central Park South, Incorporated, as landlord, and Assignor,
as tenant (the "Lease");

WHEREAS, Assignor is willing to assign the Lease
and Assignee is willing to accept an assignment of the same
on the terms and conditions hereinafter specified.

NOW, THEREFORE, in consideration of payment of ten
dollars by Assignee to Assignor simultaneously herewith,
Assignor hereby assigns unto Assignee all of Assignor's
right, title and interest in and to the Lease.

TO HAVE AND TO HOLD the same unto Assignee, its
successors and assigns, from the date hereof for the balance
of the term mentioned in the Lease subject to the terms,
covenants, conditions and provisos therein also mentioned.

AND Assignee hereby assumes performance of all of
Assignor's obligations as lessee under the Lease from and

after the date hereof and shall indemnify and hold Assignor harmless from and against any legal actions, damages and expenses, including legal fees, arising out of any failure or alleged failure to perform lessee's obligations under the Lease from and after said date.

AND each party represents to the other that it has dealt with no broker in connection with this Assignment.

This Assignment is contingent upon receiving the New York State Liquor Authority's approval of the transfer of ownership of the restaurant located in the space covered by the Lease to Assignee. If such approval is not granted, this Assignment shall be null and void.

IN WITNESS WHEREOF, the parties hereto have duly executed this Assignment as of the day and year first above written.

Assignor:

LIEDERMAN/LOWY VENTURES INC.,
a New York corporation

By: _____
Vice President

Assignee:

MAJESTIC SPORTS, LTD.,
a New York limited partnership

By: Liederman/Lowy Ventures Inc.,
a New York corporation

By: _____
Vice President

STATE OF NEW YORK  )
                    )     ss.:
COUNTY OF NEW YORK )

    On the 16th day of June, 1988, before me personally came ~~John C.~~ *William Liederman* Lowy, to me known, who being by me duly sworn, did depose and say that he resides at No. ~~50 West 34th~~ *160 Bleecker* Street, ~~Apt. 17A14~~, New York, New York 100~~01~~ *12*; that he is the *Vice* President of Liederman/Lowy Ventures Inc., the corporation described in and which executed the foregoing instrument; and that he signed his name thereto by order of the board of directors of said corporation.

                                  _____
                                    Notary Public

RONALD H. SHECHTMAN
Notary Public, State of New York
No. 31-4500873
Qualified in New York County
Commission Expires February 28, 1990

STATE OF NEW YORK  )
                   )      ss.:
COUNTY OF NEW YORK )

On the 16th day of June, 1988, before me personally came ~~John C.~~ William Liederman ~~Lowy~~, to me known, who being by me duly sworn, did depose and say that he resides at No. ~~50 West 34th~~ 160 Bleecker Street, ~~Apt. 17A14~~, New York, New York 100~~01~~; that he is the Vice President of Liederman/Lowy Ventures Inc., the corporation described in and which executed the foregoing instrument; which corporation is the general partner of Majestic Sports, Ltd., the partnership which executed the foregoing instrument; that the execution of the instrument by Liederman/Lowy Ventures Inc. was duly authorized according to the Articles of Limited Partnership; that Liederman/Lowy Ventures Inc., the general partner, executed the instrument on behalf of the said partnership pursuant to said authorization; and that he signed his name thereto by order of the board of directors of said corporation.

_____
            Notary Public

RONALD H. SHECHTMAN
Notary Public, State of New York
No. 31-4500673
Qualified in New York County
Commission Expires February 28, 1990

CERTIFICATE OF

LIMITED PARTNERSHIP

OF

MAJESTIC SPORTS, LTD.

STATE OF NEW YORK )
               : ss.:
COUNTY OF NEW YORK)

      We, the undersigned, for the purpose of forming a limited partnership pursuant to Section 91 of the Partnership Law of the State of New York, and being severally duly sworn, do hereby certify:

      1.   <u>Name</u>.  The name of the Partnership is Majestic Sports, Ltd.

      2.   <u>Character of Business</u>.  The character of the business of the Partnership is to own, operate, maintain and otherwise deal with a restaurant and bar and perform ancillary functions related thereto.

      3.   <u>Location of Principal Place of Business</u>.  The location of the principal place of business of the Partnership is 42 Central Park South, New York, New York.

      4.   <u>Name and Place of Residence of Partners</u>.  The name and place of residence of each General Partner and Limited Partner are as follows:

<u>General Partner</u>

Liederman/Lowy Ventures Inc.
42 Central Park South
New York, New York

Limited Partners

William Liederman
160 Bleeker Street
New York, New York 10012

John C. Lowy
50 West 34th Street
Apt. 17A14
New York, New York 10001

Mark R. Solit
311 Centre Court
Alameda, California 94501

Mickey Mantle
5730 Watson Circle
Dallas, Texas 75225

Program Syndication
  Consultants, Inc.
Attention:  Larry Meli
17 Ash Street
Locust Valley, New York 11560

Jan Clark
1565 Debra Lane
Incline Valley, Nevada 89450

Sam Stein
9460 Wilshire Boulevard
Beverly Hills, California 90212

5.    <u>Term of Partnership</u>.  The time at which the
Partnership is to begin is on the filing of this
Certificate, and the time at which the Partnership is to end
is the occurrence of any of the following:

(a)  December 31, 2012;

(b)  The sale, transfer or other disposition of all
or substantially all of the assets of the Partnership;

(c)  The acquisition by a Partner of all of the interests of the other Partners;

(d)  The dissolution, bankruptcy or insolvency of a General Partner or an assignment by a General Partner for the benefit of creditors, or the occurrence of an act or omission by a General Partner which results in the dissolution of the Partnership by operation of law; or

(e)  The agreement of the Partners so to do.

6.  <u>Cash and Property Contributed by each Limited Partner</u>.  The amount of cash and property contributed by each Limited Partner to the Partnership is as follows:

| Limited Partner | Cash Contribution | Agreed Values of Work Products, etc. |
|---|---|---|
| William Liederman | $200.00 | $20.00 |
| John C. Lowy | $200.00 | $20.00 |
| Mark R. Solit | $220.00 | ------ |
| Mickey Mantle | ------- | $60.00 |
| Program Syndication Consultants, Inc. | ------- | $10.00 |
| Jan Clark | $220.00 | ------ |
| Sam Stein | $ 40.00 | ------ |

7.  <u>Additional Contribution</u>.  No additional contributions have been agreed upon to be made by any Limited Partner.

8.    <u>Return of Contribution</u>.    No specific time has been established for the return of the contribution of any Limited Partner.

9.    <u>Share of Profits and Other Compensation To Be Received By Limited Partners</u>.    The share of the profits and other compensation by way of income which each Limited Partner shall receive by reason of its contribution is as follows:

| <u>Limited Partner</u> | <u>Interest</u> |
|---|---|
| William Liederman | 22% |
| John C. Lowy | 22% |
| Mark R. Solit | 22% |
| Mickey Mantle | 6% |
| Program Syndication Consultants, Inc. | 1% |
| Jan Clark | 22% |
| Sam Stein | 4% |

10.    <u>Right of Each Limited Partner to Substitute an Assignee as a Limited Partner</u>.    The transferee of the interest of a Limited Partner may become a Limited Partner in respect of such interest if the General Partner consents to such substitution.

11.    <u>Right of Partners to Admit Additional Limited Partners</u>.    No right is given to the Partners to admit additional Limited Partners.

12.  <u>Priority of Any Limited Partner as to
Contributions or Compensation</u>.  No Limited Partner is given
priority over any other Limited Partner as to contributions
or compensation by way of income.

13.  <u>Right of a Limited Partner to Receive Property
Other Than Cash</u>.  No Limited Partner has the right to demand
and receive property other than cash in return for its
contributions.

GENERAL PARTNER:

LIEDERMAN/LOWY VENTURES INC.

By: _____
        President

STATE OF NEW YORK  )
                   :    ss.:
COUNTY OF NEW YORK )

On the 25th day of April, 1988, before me per-
sonally came John C. Lowy, to me known, who, being by me
duly sworn, did depose and say that he resides at No. 50
West 34th Street, Apt. 17A14, New York, New York 10001; that
he is the President of Liederman/Lowy Ventures Inc., the
corporation described in and which executed the foregoing
instrument; and that he signed his name thereto by order of
the board of directors of said corporation.

_____
        Notary Public

BARBARA J. BRIGGS
Notary Public, State of New York
No. 31-4813253
Qualified in New York County
Commission Expires September 30, 1988

LIMITED PARTNER:

_William Liederman_
William Liederman


STATE OF NEW YORK    )
                     :    ss.:
COUNTY OF NEW YORK   )


On the 23d day of April, 1988, before me personally came William Liederman, to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that he executed the same.

_Barbara J Briggs_
Notary Public

BARBARA J. BRIGGS
Notary Public, State of New York
No. 31-4813253
Qualified in New York County
Commission Expires September 30, 1988

LIMITED PARTNER:

_____
John C. Lowy

STATE OF NEW YORK   )
                    :   ss.:
COUNTY OF NEW YORK  )

    On the 24th day of April, 1988, before me per-
sonally came John C. Lowy, to me known to be the individual
described in and who executed the foregoing instrument, and
acknowledged that he executed the same.

_____
    Notary Public

BARBARA J. BRIGGS
Notary Public, State of New York
No. 31-4813253
Qualified in New York County
Commission Expires September 30, 1988

8

LIMITED PARTNER:

Mark R. Solit

STATE OF  NEW YORK  )
                                                    ss.:
COUNTY OF  NEW YORK  )

On the 3rd day of April, 1988, before me per-
sonally came Mark R. Solit, to me known to be the individual
described in and who executed the foregoing instrument, and
acknowledged that he executed the same.

Notary Public

BARBARA J. BRIGGS
Notary Public, State of New York
No. 31-4813253
Qualified in New York County
Commission Expires September 30, 1988

LIMITED PARTNER:



Jan Clark

STATE OF *Nevada*    )
                      :    ss.:
COUNTY OF *Washoe*   )

On the 27th day of April, 1988, before me per-
sonally came Jan Clark, to me known to be the individual
described in and who executed the foregoing instrument, and
acknowledged that he executed the same.

MARY P. PASCOE
Notary Public - State of Nevada
Appointment Recorded in Washoe County
MY APPOINTMENT EXPIRES OCT. 17, 1990

Notary Public

LIMITED PARTNER:

_____
Sam Stein

STATE OF NEW YORK    )
                     :    ss.:
COUNTY OF NEW YORK   )

On the 23d day of April, 1988, before me per-
sonally came Sam Stein, to me known to be the individual
described in and who executed the foregoing instrument, and
acknowledged that he executed the same.

_____
Notary Public

BARBARA J. BRIGGS
Notary Public, State of New York
No. 31-4813253
Qualified in New York County
Commission Expires September 30, 1988

LIMITED PARTNER:

    PROGRAM SYNDICATION
    CONSULTANTS INC.

By: _____
    President

STATE OF *New York*  )
                   :   ss.:
COUNTY OF *Nassau*  )

On the 27 day of April, 1988, before me per-
sonally came Larry Meli, to me known, who, being by me duly
sworn, did depose and say that he resides at No. _____
*17 Oak St Locust Valley NY* ; that he is the
President of Program Syndication Consultants Inc., the cor-
poration described in and which executed the foregoing
instrument; and that he signed his name thereto by order of
the board of directors of said corporation.

_____
    Notary Public

GAIL KEELAN
NOTARY PUBLIC, State of New York
No. 52-4795015
Qualified in Suffolk County
Commission Expires April 30, 19 89

LIMITED PARTNER:

_Mickey Mantle_ (signature)

Mickey Mantle

STATE OF  _NEW YORK_ )
                              :    ss.:
COUNTY OF  _NEW YORK_ )

On the 23rd day of April, 1988, before me per-
sonally came Mickey Mantle, to me known to be the individual
described in and who executed the foregoing instrument, and
acknowledged that he executed the same.

_Barbara J Briggs_ (signature)

Notary Public

BARBARA J. BRIGGS
Notary Public, State of New York
No. 31-4813253
Qualified in New York County
Commission Expires September 30, 1988

**Majestic Sports Ltd**
**D/B/A Mickey Mantle Restaurant**
**42 Central Park South**
**New York, New York 10019**

February 28, 1996

40 Central Park South, Incorporated
c/o Atco Properties & Management, Inc.
555 Fifth Avenue
New York, New York 10017

Re:    40 Central Park South/
41 West 58th Street

Gentlemen:

By Lease dated August 1, 1987 ( "Lease"), the undersigned's predecessor
in interest Liederman/Lowy Ventures Inc., as Tenant, rented from you as
Landlord portions of the ground floor and cellar of the above buildings for a term
to expire July 31, 2002.

We write to confirm our understanding and agreement that effective on the
Commencement Date  (defined in Paragraph 3 below), the Lease is amended as
follows:

1.    **SPACE**

The description of the demised premises is modified to include
Suite 1J,  in 40 Central Park South (hereinafter called "Additional
Space").

2.    **PREPARATION OF OCCUPANCY AND POSSESSION**

(a)    The  Additional Space shall be constructed for Tenant's
occupancy as provided in Exhibit "A" annexed hereto.

(b)    For purposes of this amendment the Additional Space shall
be deemed substantially completed ("Substantially
Completed") on the date when Landlord's work has been
substantially completed notwithstanding the fact that
insubstantial details of construction, mechanical adjustment
or decoration remain to be completed, provided Tenant's
use of the Additional Space is not materially affected.
Landlord agrees to Substantially Complete its work by
April 15, 1996 except for the installation of the 36,000BTU
air conditioning unit which will be installed by May 15,
1996.

(c)    Landlord  at its expense will open up the Additional Space
into Tenant's existing premises at a mutually agreeable
time. Tenant at its expense (except for steps being installed
by Landlord) will do any other work required in its existing
premises arising out of break through, ie. railings, partitions
finishes, etc.



3. **COMMENCEMENT DATE**

The Commencement Date shall be the earlier of the day on which Additional Space is deemed to be Substantially Completed, or the day Tenant occupies or takes possession of the Additional Space for the conduct of its business. Upon Substantial Completion of Landlord's work, the parties shall execute, acknowledge and exchange an agreement specifying the Commencement Date. Landlord agrees to diligently complete all punch list items.

4. **CERTIFICATE OF OCCUPANCY, ETC.**

Landlord at its expense will file all appropriate papers in order to obtain a Certificate of Occupancy for commercial use of the Additional Space.

Landlord at its expense will correct all building code violations with respect to the Additional Space prior to the issuance of a Certificate of Occupancy and Public Assembly Permit except if such violations arise out of Tenant's acts or manner of use of the Additional Space.

Landlord at Tenants expense will file all necessary papers to obtain a Public Assembly Permit for the Additional Space. Tenant will reimburse Landlord upon demand for all such expenses.

5. **AMENDMENT CANCELLATION,**
**REIMBURSEMENT OF ARCHITECTURAL FEES**

Notwithstanding anything to the contrary in this Amendment, in the event Landlord is unable to obtain a Certificate of Occupancy and Public Assembly Permit to allow 44 additional patrons as set forth in Paragraph 4, by September 30, 1996, then this Amendment shall be deemed cancelled and of no further force and effect and neither party shall have any further liability to the other except that Landlord will restore original demising wall and reimburse Tenant for:

(a)    Architectural fees incurred by Tenant in connection with this Amendment up to a maximum of $2500; and

(b)    Costs incurred by Tenant in purchasing furniture and other personal property including without limitation audio visual equipment, folding partitions, service bar and lights for use solely within Additional Space up to a maximum of $12,500.00. Upon Tenant's presenting bills evidencing the purchase of such furniture, etc, Landlord shall reimburse Tenant for such costs and Tenant shall turn over such items to Landlord. In no event shall Landlord's reimbursement under 5 (b) exceed $12,500.

If Landlord is unable to obtain a Certificate of Occupancy and/or Public Assembly Permit solely for the reason that there are insufficient lavatories and/or insufficient handicapped accessible lavatories, Landlord will advise Tenant of such fact. Landlord will also advise Tenant of the additional area required in the Additional Space or in the demised premises in order to install said lavatories. Tenant shall have the option to either require Landlord to install

2

said lavatories at Landlord's expense with similar finishes as existing lavatories or cancel this Lease Amendment. If Tenant elects to cancel the Lease Amendment, Landlord will reimburse Tenant as provided in subdivisions (a) and (b) above.

6. **RENT**

On November 1, 1996, the Fixed Annual Rent shall be increased by $25,200.

7. **INCREASE IN FIXED RENT**

Effective on such of the dates set forth below the Fixed Rent then in effect shall be increased by the following amounts:

| Date of Increase | Amount of Increase |
|---|---|
| November 1, 1997 | $ 1,008.00 |
| November 1, 1998 | $ 1,048.32 |
| November 1, 1999 | $ 1,090.25 |
| November 1, 2000 | $ 1,133.86 |
| November 1, 2001 | $ 1,179.21 |

The foregoing increases in Fixed Rent shall be in addition to the increases in rent provided for under Articles 42 and 43 of the Lease.

8. **POTENTIAL DELAY IN RENT COMMENCEMENT**

If Landlord's work as provided for in Article 2 is not Substantially Completed by April 15, 1996 or the 36,000 BTU air conditioner is not installed by May 15, 1996, than notwithstanding anything to the contrary in Articles 6 and 7 the effective date for the rent increases as provided in said Articles shall be extended by one day for each day that the work is not Substantially Completed or the air conditioner not installed.

9. **NO CPI ADJUSTMENT**

The increase in Fixed Rent provided for in this Letter Agreement for the Additional Space shall _not_ be used in computing in adjustments in Fixed Rent as provided for in Article 42.

10. **ELECTRIC AND GAS**

Article 46 of the Lease entitled "Electricity and Gas" shall be applicable to the additional space.

11. **MAINTENANCE AIR CONDITIONING UNITS**

Landlord as part of its work is installing a new three (3) ton air conditioning unit. During the first year after installation of the new air conditioning unit, Landlord shall maintain the unit and perform any necessary repairs thereto except to the extent that such repairs are necessitated by the negligence or improper conduct of Tenant or any of Tenant's employees or invitees. In addition, the Additional Space has two (2) air cooled through the wall air conditioning units (said three (3) units are hereinafter collectively "Units"). Landlord shall have no responsibility or liability for the performance of the Units or their maintenance, repair or replacement except for the new Unit as previously set forth. Tenant shall, at its sole cost and expense, make all repairs and perform all

maintenance in respect of the Units and obtain any and all governmental permits required in connection therewith. At the end of the Term, Tenant shall surrender the Units in working order and condition, reasonable wear and tear excepted.

12. **TENANT'S REPRESENTATIVE**

Tenant hereby constitutes and appoints Bill Liederman its representative to deal with Landlord in connection Tenant's work and Landlord's work. Any notices and/or approvals given to or by said representative shall be binding upon Tenant. Tenant may change such designation by notice in writing to Landlord.

13. **TELEVISION**

Landlord agrees that Tenant may install a maximum of four (4) televisions in the Additional Space provided that such televisions shall be installed in such a manner that they are not visible from either the gardens or 41 West 58th Street apartments.

Tenant acknowledges that the Landlord on a temporary basis has allowed it to use the building cooling tower in order to air condition the demised premises. Landlord at its sole cost and expense shall:

(a) Furnish and install a 25 ton cooling tower in the air conditioning fan room located in the cellar of the demised premises and connect same to Tenant's air conditioning system. Tenant shall pay for all water used in said cooling tower in accordance with provisions in Article 28.

(b) After the performance of (a) above, Landlord will disconnect Tenant's air conditioning system from the building's cooling tower.

Upon completion of the above work, Article 45 of the Lease shall once again be in full force and effect and Landlord and Tenant will each comply with their respective obligations under said article except for Landlord's obligation during the first year of operation as set forth in Article 11 of this Amendment.

Landlord and Tenant represent and warrant that they dealt with no broker in connection with the negotiation of this Lease Amendment, and agrees to indemnify and save the Landlord harmless from any claim of any other brokers, firms or entities.

If the foregoing correctly sets forth our understanding and agreement, please indicate such fact by signing and returning the duplicate copy of this letter.

Very truly yours,

Majestic Sports, Ltd.
D/B/A Mickey Mantle Restaurant

By: _____

Accepted and Agreed to:

40 CENTRAL PARK SOUTH, INCORPORATED

By: _____

4



# MICKEY MANTLE'S RESTAURANT

FEBRUARY 13, 1996

## EXHIBIT "A"

1. DEMOLISH SPACE, INCLUDING EXISTING BATHROOM (DOTTED LINES DENOTE DEMOLITION).
2. EXISTING 15,000 BTU AND 12,000 BTU THROUGH WALL HEATING AND AIR CONDITIONING UNITS TO REMAIN.
3. PROVIDE AN ADDITIONAL 36,000 BTU OF COOLING IN "ADDITIONAL SPACE."
4. REMOVE (4) EXISTING WINDOWS. REPLACE (3) WITH ONE PIECE OF FIXED GLASS AND BRICK UP THE LAST OPENING.
5. HANG SHEETROCK CEILING AS NECESSARY TO PROVIDE CONTINUOUS LEVELS.
6. PATCH AND PAINT WALLS, COLUMNS AND CEILING.  PREPARE FLOOR FOR NEW CARPET (CARPET AT TENANT'S EXPENSE).
7. REPLACE DOOR TO BUILDING CORRIDOR WITH NEW 3'-0" DOOR.
8. BREAKTHROUGH TO RESTAURANT AND PROVIDE NEW STEPS.
9. ALL OTHER WORK NOT NOTED HEREIN INCLUDING RAILINGS, PARTITIONS, LIGHTING, ELECTRICAL, FINISHES, FURNITURE, WAITERS' STATIONS, TV, ETC. IN ADDITIONAL SPACE AND/OR TENANT'S EXISTING SPACE IS TO BE AT TENANT'S EXPENSE.

<u>COMMENCEMENT DATE AGREEMENT FOR ADDITIONAL SPACE</u>

AGREEMENT made this 17 day of April, 1996 by and between

40 CENTRAL PARK SOUTH, INCORPORATED, having offices at 555 Fifth

Avenue, New York, New York 10017 ("Landlord"), and MAJESTIC

SPORTS Ltd. D/B/A MICKEY MANTLE RESTAURANT, having offices at 42

Central Park South, ("Tenant");

By agreement of Lease Amendment dated February 28, 1996

("Lease Amendment"), Landlord leased to Tenant Suite 1J at 40

Central Park South ("Additional Space") for a term ("Term") to

commence upon Landlord's substantial completion of the work

described in Paragraph 2. Landlord has substantially completed

all work described in Paragraph 2;

WHEREAS, Paragraph 3 of the Lease Amendment provides that

the parties shall execute and exchange an agreement specifying

the commencement date of the Term for the Additional Space;

NOW, THEREFORE, the parties hereby agree that the Term shall

commence on April 15, 1996 and shall expire on July 31, 2002.

MAJESTIC SPORTS LTD.
D/B/A MICKEY MANTLE RESTAURANT

BY _____

40 CENTRAL PARK SOUTH, INCORPORATED

BY _____